## Case No. 15,683.

### UNITED STATES v. McKEE.

[3 Cent. Law J. 258;[1] 22 Int. Rev. Rec. 135; 1 Cin. Law Bul. 107.]

Circuit Court, E. D. Missouri. April 8, 1876.

CRIMINAL PROCEDURE—NEW TRIAL—BIAS OF JUROR—EVIDENCE—NEWSPAPER REPORT OF TRIAL.

1. On a motion for a new trial in this case, one of the grounds was that a juror had, previous to the trial, uttered sentiments which showed a bias against the prisoner, whereas he had stated on his voir dire that he had not formed or expressed an opinion with reference to the defendant's guilt or innocence. To enable the court to pass upon this question, the court not only received affidavits, but required the principal witnesses to be examined orally before it.

2. In this case it was shown by the testimony of a witness that some days before the trial, a person, who afterwards sat as a juror in the case, had said, "McKee has got his foot in it—is guilty—is the biggest toad in the puddle." The juror in question denied on oath that he made this statement. The juror had testified on his voir dire that he had not formed or expressed an opinion relative to the defendant's guilt or innocence. Held, on comparison of the testimony and of the supporting and rebutting affidavits and other testimony adduced, that it was not sufficient to overcome the statement of the witness made on his voir dire, and to show the juror to be disqualified.

3. The rulings upon this trial as to the testimony of Megrue, a conspirator, that he gave to Lancaster, a co-conspirator, certain moneys to be paid to the defendant, and as to the effect of the subsequent declarations of Lancaster, that he did give the money to the defendant [Cases Nos. 15,685 and 15,686], reaffirmed.

4. On Sunday morning, January 30, after all the testimony on this case had been heard by the court, a "leader" appeared in the Saint Louis Republican, evidently intended to be read by the jury, entitled "What the Jury will Read." This article exhibited a decided bias against the prisoner. Two copies of the paper which contained the article were purchased by members of the jury; but there was no proof that the article was read by any of them. The jury were under instructions which permitted them to read reports of the trial, but not editorial comments upon the case. Held, no ground for a new trial.

5. The court animadverted upon attempts of newspapers to influence the minds of jurors pending a trial.

Indictment [against William McKee] for conspiring to defraud the government out of revenue on distilled spirits. [For prior proceedings see Cases Nos. 15,685 and 15,686.] Motion for new trial. The motion was heard in part on oral testimony as stated in the first paragraph of the head note. The other facts sufficiently appear in the opinion of the court.

W. H. Hatch, Henry A. Clover, and Chester H. Krum, for the motion.

David P. Dyer, U. S. Dist. Atty., with whom were James O. Broadhead and Lucien Eaton, contra.

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge (orally). In the case of the United States against William McKee, the indictment is under section 5440 of the Revised Statutes [14 Stat. 484], which is in these words: "If two or more persons conspire together," that is, necessarily persons not occupying an official position, "to commit any offence against the United States, or to defraud the United States in any manner, or for any purpose, and one or more of such parties do any act to effect the object of such conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than $1,000 and not more than $10,000, and to imprisonment for not more than two years." In the case under consideration, there was a trial extending through several days, resulting in a verdict of "guilty." A motion is made by the defendant for a new trial upon three grounds. One of these grounds is for misconduct, or rather disqualification on the part of one of the jurors, viz.: Mr. Hugh F. Summers. The second ground is the reception in evidence of certain declarations of Leavenworth made to Megrue. The third ground is misconduct—it comes under that general name—on the part of the jurors, in reading a certain article published on the Sunday after the arguments had been concluded, and prior to the charge of the court; that article being published in the Missouri Republican, and headed, "What the Jurors will Read."

I will briefly state the views which the court entertains after argument and consulta-

---

[1] [Reprinted from 3 Cent. Law J. 258, by permission.]

tion in respect to these three points; and first, as to the question whether Mr. Summers was a qualified juror. The disqualification is alleged to consist in the fact that before he went upon that jury panel he had formed, or, at all events, had expressed, an opinion relative to the guilt of the defendant, to the effect that he was guilty. If this is true, that is, if it were judicially established that that was so—it was admitted at the bar and undoubtedly is the law—it would be good ground for a new trial. There being no difference as to the law, the result depends on a question of fact. And how stands the proof in that regard? When this motion was made and the affidavits filed, stating that this declaration on the part of Mr. Summers had been made to one Foster, we said, knowing the advantage in investigating disputed questions, of having the witnesses before us, "If this question turns on the respective credibility of these two men—Mr. Summers, the juror, on the one hand, and Mr. Foster on the other—we must have them before us, so that they may be examined orally, and subjected to cross examination," and we have taken every means within our power, appreciating the magnitude of this case, and the interest which it involves to the government, and possibly the still greater interest which it involves to the defendant, of getting all the facts bearing on this question; we have subjected the statements of all these witnesses to repeated examinations and to severe scrutiny. Mr. Foster stated in his affidavit that about eight days before the trial, at Lansdowne's store, or near there, he met Summers, and Summers stated in substance: "McKee has got his foot in it; is guilty; is the biggest toad in the puddle," and that he (Foster) made no reply to that. He also stated in his affidavit, and repeated the statement on the trial, that after the trial was over, he met Summers, and he names the place, and that thereupon, when they crossed over the street together, he remarked to Summers that they must have had jolly discussions, as they had been out eleven hours before they had agreed upon a verdict; to which Summers replied that he was very well posted, as he had taken pains to read up after he was summoned to serve on the jury. That is the substance of what Mr. Foster said, both in his affidavit and in his oral statement. Mr. Summers was summoned as a juror on the sixth day of January, requiring his presence here on the 20th. The officer who summoned him very prudently said to him, "You will avoid a good deal of embarrassment if you keep this thing to yourself." It was very well known to everybody that there was a great excitement concerning these trials, and he gave him very prudent advice, which Mr. Summers stated he observed. He also states that he did not even tell his partners that he was summoned on the jury till a very short time before he came here, so sedulously did he follow that instruction. Mr. Summers, when he was called into the jury-box, was sworn on his voir dire, and the question being put to him, he said he had formed or expressed no opinion concerning the guilt of McKee, but in his cross-examination admitted that he had a conversation about it. The way this matter has turned out, it is, perhaps, to be regretted that the counsel for the defendant did not pursue that a little more fully, but he pursued it as far as he chose. Mr. Summers said he had a conversation about this matter, but nevertheless he had formed or expressed no opinion as to the guilt of the defendant. When he made that statement, he was under oath, and it was a statement made under oath at a time when, so far as we can know, he had no motive, such as may possibly be ascribed to him afterwards, when he is attacked, to misstate the facts.

To serve on a jury is a duty that I suppose men in general would rather avoid than discharge, unless there is some latent, some undiscoverable motive. Most men—and perhaps, Mr. Summers—would have been very glad to have avoided that duty. If he did not, we do not know any reason why he should desire, for any sinister or improper purpose, to have served on that jury. So that, in determining this question of fact, we have the oath of Mr. Summers at the time when he was sworn, and when, so far as we know, there was no motive for him to misrepresent, that he had not formed or expressed an opinion concerning the guilt of the defendant; and on the examination, after his qualifications were attacked by the affidavit filed here by Mr. Foster, he states the same thing, and says: "I never had that conversation with Foster; it is not true." He denies it in toto, and denies the subsequent conversation which Mr. Foster imputes to him. It is a plain, unqualified contradiction between these men in respect to these conversations. Now in determining where the truth lies, we are forced to resort to other circumstances, and unfortunately these are by no means conclusive. Against Mr. Foster certain affidavits have been produced, the affidavits stating that his reputation for truth and veracity is not good, neither in the county where he now lives, nor in another county from which he came. Certain of these affiants who thus depose as to character, are shown to have been connected with his family, and may be supposed to have had a family grudge or feud. We attach little or no importance to such evidence, but there are several affidavits of men, the sheriff and other men of character, who are not shown to have any personal pique or bias against Mr. Foster, who made a similar affidavit. On the other hand, Mr. Foster has brought in a large number of affidavits from the county where he now lives, and from that in which he formerly lived, from men of various occupations, and in various stations, to the effect that his character is good for truth and veracity; that is where that stands. There is no attack by any

affidavit on the character of Mr. Summers for truth and veracity. Mr. Foster, when interrogated in regard to the details of these conversations, while he seemed to have a very distinct recollection that Mr. Summers used these words, was not able to state how the conversation originated, how it came up, or what further was said. His mind seemed to rest on those words, and that was all he could recall concerning it. The occasion of the conversation, what else was stated in it, who, if anybody, else was present, he has not been able to recall; and the time in which he locates it seems to show that it is indefinite in his recollection or that he must be mistaken, in view of other circumstances. In his affidavit, he says that this conversation with Summers was about eight days before the trial. That would make it six days, or about that, after Summers was summoned. In his letter in which he communicated this to Mr. McKee, or the paper from which Mr. McKee got it, which was not read, but which counsel produced and showed to us, this time was stated to be several days before the trial, and in the conversation with Mr. Purse, the postmaster, he, Foster, located it at about two weeks before Summers went down to attend the trial. In his oral statements before the court, he said it was one or two weeks. Finally, on cross-examination, he really could not tell definitely whether it was before the 1st of January or afterwards, but he thought it was afterwards; so it stands in relation to the first conversation. In reference to the second conversation about having a jolly time at the discussion, and Summers saying that he had read up, that he had taken the pains to do so after he was summoned, and that he was well posted, which Mr. Foster imputes to Mr. Summers, Mr. Summers says is untrue; he says that he read nothing concerning this after he was summoned, and that, of course, when Foster says he admitted he had posted himself up, he must be mistaken about it, that it was not the fact, and he would not be likely to admit that it was a fact; and certain affidavits are relied on here as rather confirming Mr. Summers in that regard; for example, the affidavit of Mr. Pugh, the ex-sheriff of that county, who says that Foster, Summers and himself were there, and Foster came up, and it was asked "what all this meant?" and some one replied, in substance, "Why, here is Summers just back from the trials," and Foster, according to Pugh, then inquired, "What, has McKee been tried? I didn't know that the trial had taken place." That is Mr. Pugh's statement of what Foster said. Foster, on the stand as a witness here, contradicts that, and says: "I could not have said that, because I did know the trial was going on, and did know that it had taken place." Nevertheless, there is the statement of this witness that Mr. Foster did say this.

Now in looking over all this, we have been unable to discover one circumstance of moment which really corroborates Mr. Foster in the matter; so far as there are any corroborating circumstances, they are the other way. If you look at the character of the two men, without pronouncing any judgment on the matter, certainly the preference cannot be given to Mr. Foster. That is enough to say. I attach very little importance to an affidavit to the effect that some man has the opinion of another that he is not a man of truth and veracity. I do not intend to reflect on Mr. Foster in anything. I may say—I simply say—in summing up this matter, it cannot be said that in that respect Mr. Foster has any advantage of Mr. Summers; if there is any difference, looking at it in the light of these affidavits for what they are worth, it is the other way. Then the other circumstances, as to want of definiteness, as to how this conversation arose, what was the occasion of it, what further was said, want of certainty as to the time, or, if he locates it after this man was summoned, the improbability that he would disobey the injunction given to him and read this testimony, when he says he did not read it, the outside probabilities would rather be in favor of Mr. Summers; and, at best here is, after a trial, the oath of one man against the oath of the juror. Now, in a trial attended with as much excitement as this one was, when there are so many chances for mistake and misunderstanding of what a man stated, and there is a deliberate verdict of the jury, we cannot—and so the courts have frequently decided—set aside a verdict unless we are satisfied that the showing made against a juror's qualifications, raises at least a presumption in favor of guilt; and this ground for a motion for a new trial, in our judgment, fails to show by a preponderance of evidence that that allegation against Mr. Summers is true in point of fact. Mr. Summers admits that he had a conversation at some time on the street with Mr. Foster. Mr. Foster might have imputed to Mr. Summers what some one else stated to him, and he might have misconstrued it. I am the last person in the world to impute any wilful wrong on the part of Mr. Foster; certainly his manner impressed me not unfavorably on the stand. He seemed to believe this, and I am satisfied in my own mind that he has not undertaken here to impose or perpetrate a wilful fraud by any means. His letter, in which he communicated this information, shows that he has a good deal of feeling on the subject, and perhaps it tends to show that a man, in time of excitement on a subject in which he seems to have felt a good deal of interest, might have formed and intensified an impression by perpetually thinking on the subject; and Mr. Foster seems to have thought a good deal about it. It is enough to say that the showing is not sufficient to overcome the oath of the juror that he entered the box without having formed any opinion.

In regard to the other ground, as to the

charge of the court on the subject of the declarations of Leavenworth, I do not think it necessary to go at length into that. It was argued for several days; all the authorities were produced, and we took time to consider it. The opinion is in writing [Cases Nos. 15,685 and 15,686], and, considering the arguments addressed to us, we see no reason to change that ruling. Several witnesses had testified as to the existence of this conspiracy between the distillers, Joyce and McDonald, and the revenue officers. Megrue testified that he was the collector for the ring, and that every week they made their collections, and every week they distributed the money; that he was the collector and distributor; that Leavenworth, a gauger, now deceased, was made use of by him to distribute the money; that he put it in packages; that one-fifth was set apart every week for the defendant, and that he gave it to Leavenworth, with directions to deliver this part to him. It was objected to at first that what Megrue said to Leavenworth at the time he gave him the money to deliver, could not be received in evidence for any purpose, but on the argument that was abandoned by defendant's counsel; but they did insist that Megrue could not testify as to subsequent declarations of Leavenworth to him as to whether he had delivered the money, and we admit no other declarations—no other declarations of Leavenworth to anybody but Megrue, nor made at any other time—at least that was our ruling, and no exception was taken on the trial that the declaration offered to be produced in evidence was given at any other time; that those declarations were made at any other time than to Megrue when he came back for the weekly amount. Now, then, we said: "We admit this as part of the res gestæ of the transaction of setting apart and receiving the money; it is necessary to explain why he went back." Megrue said week after week he delivered the money, and we said, this cannot be used by the jury as independent evidence to convict Mr. McKee with fraud; that must be proved by other evidence; and we endeavor to make that very emphatic, and are surprised that in the way we limited it, counsel think there is any objection to it. We said in our charge: "Leavenworth reported to Megrue, as the latter swears, when subsequently receiving packages, that he had distributed or delivered to McKee and Ford the packages previously received for them. But, as we instructed you on the trial, and now repeat, such declarations, that is, the declarations of Leavenworth to Megrue when he went back for money, from week to week; such declarations, while they are competent evidence to show the relations of Megrue and Leavenworth to each other and to the transaction, and to explain the act of receiving the money from week to week, they are not competent to establish the fact that the defendant McKee did receive the money; but such fact which, under the circumstances of this case, is equivalent to connecting him with the conspiracy, must be shown by evidence other than the mere declarations and statements of a confessed conspirator, not made to or in the presence of the defendant." Now, then, suppose we had this case to try over again, and Mr. Megrue goes on the stand and testifies that he set apart those packages, and that he gave one of them to Mr. Leavenworth, with instructions to deliver it. Now, he comes back the week after for another package; is it not part of the transaction what he says, and did we not lay down the law as favorably for the defendant, no more favorably indeed, than he was entitled to, but as favorably as the principles of law would justify; that it was receivable only to explain that transaction, and we told the jury that that could not be received as any evidence to establish the fact that the defendant received it, so that they could not have mistaken their duty and were not, as we think, misled. Some suggestion was made on the argument here, that certain declarations on the subsequent trial against Babcock were excluded, and certain declarations were excluded for the purpose for which they were offered. But the two cases bore no resemblance to each other; no witness testified, "I gave a certain amount to Joyce in money, set it apart, and directed him to pay it to Babcock." Aside from that, when that evidence was offered, we asked the district attorneys, and the record will so show, "Do you offer these declarations for the purpose of implicating the defendant?" They said, "Yes." We said to them, as we said in this charge to the jury, "You can not implicate another by the declarations of a conspirator until the conspiracy is otherwise established," and refused to receive declarations of that sort. Then, again, in the case against Mr. McKee, there were several witnesses who testified directly to the conspiracy, and to the facts, from which the jury might infer the defendant's connection with it. There was no such evidence in the Babcock case; whether he was connected with it depended entirely upon telegrams, and to the credibility which would be given to the witnesses, Everest and McGill. In their legal aspect, the circumstances in which these two questions arose were not at all similar, and in looking over it, we both concluded the law was laid down in entire accord in both cases, though, for certain purposes, declarations were received in the one case, whereas under the circumstances and for the purposes for which they were offered, we held they could not be received in the other.

The third ground of the motion for a new trial is in respect to the newspaper article, and in the judgment of both of us, that was an improper article to be published when the jury was about to take the case under

consideration, if it was intended it should be read by them. The courts, before they were disabled by act of congress, treated all articles, calculated to influence the result of a pending case, as contempts of their authority, and punished the writers of such articles accordingly. Now, that article can not be read without showing that there was a bias, at all events, against the defendant. That is undeniable, and if there is good reason to believe that that article had been read by the jury, and had influenced their verdict, if it was shown here conclusively that it had been read by them, we might be obliged, though we would be otherwise satisfied with the verdict, on legal principles, and following established precedents in this regard, to give the defendant a new trial. I make these remarks, because it ought to be understood that all attempts to influence the public mind, and particularly to influence jurors when they have a case, civil or criminal, before them, are improper; and, I think, when journalists, respectable journalists, understand this, they will act accordingly. But it is to be remembered in this case that we said to the jury, after having first prohibited the reading of papers: "You may read papers containing a report of this trial, but you must not read any editorial comments or articles criticising the trial one way or the other." It is in evidence that this article was published, but there is the affidavit of no juror or other person that it was ever read. Mr. Stevens, the bailiff, testifies that two copies of the paper were bought by the jury, but no witness stated that this article was ever read by a juror. Now, in view of the fact that we had cautioned the jury against reading such articles, and this article disclosed that it was an improper one by the very heading of it, shall we suppose that the jury disregarded their duty without any showing, or must we suppose that they did not? That is a matter that, if it were true, could have been shown by the affidavit of jurors, but there is no such affidavit; and on that ground we think that the motion for a new trial must fail, the same as the others.

[NOTE. The defendant then moved in arrest of judgment and to dismiss, on these grounds: (1) That there was no indictment against the defendant pending in the circuit court. (2) That the circuit court has no jurisdiction of the case. (3) That the defendant was not tried on the original indictment, but on an alleged copy thereof. The court overruled both of these motions. Susequently the president granted the defendant an unconditional pardon, which he exhibited with his plea. See Case No. 15,687. To this plea the plaintiff demurred, which demurrer was overruled. Id. 15,688.]