(April 24, 1915.)

STATE, Respondent, v. SAMUEL TILDEN, Appellant.

[147 Pac. 1056.]

INDIAN RESERVATION—RAILROAD RIGHT OF WAY—INDIAN TITLE EXTINGUISHED — HOMICIDE—JURISDICTION—NEWSPAPER REPORTS—INTRODUCTION INTO JURY-ROOM — INTOXICATION OF WITNESS — CROSS-EXAMINATION.

1. At a time prior to the date of the treaty between the United States and the Nez Perce Indians wherein it was agreed that the United States would, for a period of 25 years, prohibit the introduction of intoxicating liquors into the country then embraced within the boundaries of the Nez Perce Indian reservation, the government, by act of Congress, granted a railway right of way through said reservation, and it was provided in said act that the compensation to be paid to the Indians for said right of way should be fixed by the Secretary of the Interior, agreed to by the Indians, and paid before any right under said act should accrue to the railway company. *Held*, that the Indian title to the land embraced within the right of way was extinguished prior to the date of the treaty and that the land included therein was not "Indian country."

2. The appellant, a Nez Perce Indian policeman, pursuant to instruction from his superior officer, went upon said right of way

at a point where it crosses the former Nez Perce Indian reservation, in order to search other Nez Perce Indians suspected of having intoxicating liquors in their possession, and while there, in an encounter with one of said Indians, shot and killed him.  *Held,* that the state courts, and not the federal courts, have jurisdiction to try appellant for such homicide.

3.   In this case the court ordered that if any daily newspapers were given to the jurors during the course of the trial any report of the proceedings of the trial therein contained should be cut from such papers or that the members of the jury should not read such report.   It appears that during the trial a certain daily newspaper published a purported report of said proceedings including a purported dying declaration of the deceased, which, so far as is disclosed in the record, was never made.   Although the order of the court excluding such newspaper report from the jury does not appear in the reporter's transcript, it does appear from an affidavit which was incorporated in the bill of exceptions and statement of the case upon motion for a new trial which was stipulated by counsel for both parties to be true and correct and which was settled and allowed as such by the trial court.   *Held,* that said matter of the introduction of said newspapers into the jury-room is properly before this court for consideration upon appeal from the order overruling and denying the motion for a new trial.

4.   If the bailiff cut the articles complained of from the newspapers before they were given to the jurors or if no member of the jury read said articles, it was incumbent upon counsel for the respondent to show such fact in opposition to the motion for a new trial and the failure so to do raises a presumption that the newspapers, containing such articles, got into the possession of the jury and were read by its members.

5.   Upon a showing made by appellant that the jury was permitted to read said newspapers, in the absence of a showing upon the part of respondent that the articles complained of had been cut therefrom or that none of the jury read said articles, the court should have arrested the judgment and granted a new trial.

6.   It is proper upon cross-examination to inquire of a witness to an encounter as to any facts showing his ability or lack of ability, to properly observe, clearly understand, remember and relate what took place and, under the circumstances in this case, it was error for the court to prevent the appellant from inquiring of a witness, on cross-examination, as to whether he had been drinking on the evening of the homicide.

APPEAL from the District Court of the Second Judicial District for the County of Nez Perce.   Hon. Edgar C. Steele, Judge.

Appellant was charged with murder and convicted of manslaughter.   Judgment reversed.

McNamee & Harn and J. L. McClear, for Appellant.

"In criminal cases, and especially in capital felonies, where members of the jury are permitted to read editorial comments unfavorable to the accused, a new trial ought always to be granted."  (Thompson and Merriam on Juries, sec. 531, p. 413, note and authorities cited; *People v. Murray,* 85 Cal. 350, 24 Pac. 666; *Farrer v. State,* 2 Ohio St. 54; *Walker and Black v. State,* 37 Tex. 366; *Hare v. State,* 4 How. (Miss.) 187.)

If the state had refuted the statements contained in defendant's affidavits in support of motion for new trial by all the other jurors except Le Clair, which it had an opportunity to do and did not do, then the objection raised by defendant might not be tenable.   (*People v. Goldenson,* 76 Cal. 328, 19 Pac. 161; *People v. Williams,* 24 Cal. 31.)

"Where the intention to convey a fee does not appear, as in case of the conveyance of a 'right of way' for the railroad through certain lands, the company takes an easement only." (2 Elliott on Railroads, sec. 398.)

"The grant of a right of way to a railroad company is the grant of an easement merely and the fee to the soil remains in the grantor."   (14 Cyc. 1162; 6 Am. & Eng. Ency. 531; Redfield on Railways, pp. 267, 268 (cases cited); *Smith v. Townsend,* 148 U. S. 490, 13 Sup. Ct. 634, 37 L. ed. 533; *Northern Pac. Ry. Co. v. Townsend,* 190 U. S. 267, 23 Sup. Ct. 671, 47 L. ed. 1044.)

The United States has exclusive jurisdiction to enforce liquor laws over the right of way of the Palouse & Spokane Ry.   (*State v. Lott,* 21 Ida. 646, 123 Pac. 491; *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. ed. 520.)

The defendant at the date of the alleged shooting and at the date of the death of the deceased was a United States officer in

the discharge of his duties, and as such is triable only in the United States court. (*In re Waite,* 81 Fed. 359; *Tennessee v. Davis,* 100 U. S. 257, 25 L. ed. 648; *United States v. Lipsett,* 156 Fed. 65; *Ohio v. Thomas,* 173 U. S. 276, 19 Sup. Ct. 453, 43 L. ed. 699.)

J. H. Peterson, Atty. Genl., T. C. Coffin and E. G. Davis, Assts., and Miles S. Johnson, for Respondent.

Since we must presume that the jury did not violate the court's instructions (2 Thompson on Trials, 2d ed., sec. 2616), it is fair to presume that the jury did not read the newspaper report, although they might have read all the rest of the paper; or if this presumption seems too violent, then we can presume that the bailiff, a court officer, performed his duty and culled from these papers all reference to the trial of the defendant. (*United States v. McKee,* 3 Cent. Law J. 258, Fed. Cas. No. 15,683; *United States v. Reid and Clements,* 53 U. S. (12 How.) 361–366, 13 L. ed. 1023–1025; *People v. Gaffney,* 14 Abb. Pr., N. S. (N. Y.), 36; *Mattox v. United States,* 146 U. S. 140, 13 Sup. Ct. 50, 36 L. ed. 917; *State v. Cucuel,* 31 N. J. L. 249, 263.)

The case of *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. ed. 520, involved merely the question as to whether the introduction of liquor and the sale thereof to an Indian in Culdesac, which is within the exterior boundaries of the Nez Perce Indian reservation, was a violation of sec. 2139, as being "Indian country" within the terms of the treaty between the Nez Perce Indians and the United States. The question of the territorial jurisdiction of Indian police was not there passed upon nor considered. An Indian police has no authority to arrest without a warrant, except for a misdemeanor committed in his presence. (*John Bad Elk v. United States,* 177 U. S. 529, 20 Sup. Ct. 729, 44 L. ed. 874.)

MORGAN, J.—On the evening of May 6, 1914, the appellant, a Nez Perce Indian policeman, together with some other Indian policemen, under the direction of Theodore Sharp,

Esq., superintendent of the Nez Perce Indian school at Lapwai, Idaho, went to Joseph, a station on the Northern Pacific railway, at a point where said railway, which was formerly the Palouse & Spokane railway, crosses the former Nez Perce Indian reservation, for the purpose of intercepting certain other Nez Perce Indians who were returning from Pullman, Washington, where they had gone to play baseball, and for the purpose of making search of said Indians and their baggage to ascertain if they had any intoxicating liquor in their possession, and with a view to preventing the introduction of such liquor upon former Nez Perce Indian reservation, if any was found; and with the further intention of arresting any of said Indians who might be found to be violating the laws of the United States prohibiting the introduction of such liquor into the Indian country. While at the station, the appellant had an encounter with one William Jackson, a Nez Perce Indian, who had accompanied said baseball players, in which the appellant shot the said Jackson and inflicted a wound upon him from the effects of which the said Jackson, on May 8, 1914, died. The point at which the homicide occurred was upon said railway right of way.

The defendant was arrested by the state authorities, and a trial upon a charge of murder preferred against him by the prosecuting attorney of Nez Perce county resulted in his conviction of the crime of manslaughter, from which judgment of conviction and from the order of the court overruling his motion for a new trial he has appealed to this court.

A number of assignments of error have been made on behalf of the appellant by his counsel in support of these appeals, which have been grouped in his brief and have been argued under five points, or subdivisions, wherein it is contended that the court, erred as follows:

1. In permitting copies of a certain newspaper to be given to and read by the members of the trial jury, which said copies, it is contended, contained matter prejudicial to the rights of the defendant;

2. (a) In refusing to quash the information; (b) refusing to advise the jury, at the conclusion of respondent's testimony,

to acquit the appellant: (c) overruling appellant's motion in arrest of judgment; (d) holding that the trial court had jurisdiction to try appellant on the charge set out in the information.

3. In giving to the jury instructions which the court gave;

4. In refusing to give the jury appellant's requested instructions numbers 1, 3, 4, 5, 6 and 7;

5. Insufficiency of the evidence to support the verdict of the jury or the judgment or sentence of the court.

We will first consider the specifications of error relied upon and urged by the appellant attacking the jurisdiction of the court, which are embraced in the foregoing subdivisions, numbered 2, 3, 4 and 5.

A number of authorities are cited and relied upon by appellant in support of his contention that the federal courts, and not the state courts, have jurisdiction of the crime charged in the information, among which the case of *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. ed. 520, may be said to be most directly in point.

The opinion in case of *Clairmont v. United States,* 225 U. S. 551, 32 Sup. Ct. 787, 56 L. ed. 1201, which arose from a state of facts similar to those here under consideration, discusses the said case of *Dick v. United States,* and distinguishes it from cases of this kind. We will consider said cases together.

In case of *Dick v. United States, supra,* it was held that under a treaty with the Nez Perce tribe of Indians, which was agreed to between the Indians and the agents of the government on May 1, 1893, the United States retained jurisdiction for the purpose of prohibiting the introduction of intoxicating liquors into the territory then comprising the Nez Perce Indian reservation. The part of the treaty relating to the prohibition of the introduction of such liquors is to be found in art. 9 of said treaty, 28 Stat. at L. 330, and is as follows:

"It is further agreed that the lands by this agreement ceded, those retained, and those allotted to said Nez Perce Indians shall be subject, for a period of twenty-five years, to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country. . . . . "

The facts in the case of *Dick v. United States* are that said Dick was arrested with intoxicating liquors in his possession in Culdesac, a village located under the United States townsite laws within the outside boundaries of the territory, which was formerly the Nez Perce Indian reservation, at a time subsequent to the date said treaty was agreed to and subsequent to its approval by Congress. The segregation or location under said townsite laws was made after the consummation of the treaty above referred to.

The case of *Clairmont v. United States, supra,* decides that a railroad right of way across the Flathead Indian reservation in Montana is not a part of the said reservation in contemplation of the act of Congress of January 30, 1897 (29 Stat. at L. 506, U. S. Comp. St. 1913, sec. 4137, 3 Fed. St. Ann. 384, 385), prohibiting the introduction of intoxicating liquors into the Indian country, for the reason that the Indian title as to said right of way had been extinguished prior to the adoption of said act.

In the Clairmont case it appears that the government of the United States, by an act of July 2, 1864 (13 Stat. at L. 365–367), granted to the Northern Pacific Railway Company for the construction of a railroad and telegraph line, a right of way through the public lands to the extent of 200 feet in width on each side of said railroad, including all necessary ground for station buildings, workshops, etc., and it was further provided that the United States should "extinguish as rapidly as may be consistent with public policy and the welfare of said Indians, the Indian title to all lands falling under the operation of said act"; that thereafter and on September 2, 1882, an agreement was reached between the United States and the Indians whereby the Indians surrendered and relinquished to the United States all of their right, title and interest to said strip of land granted to the Northern Pacific Railway Company. The opinion in the Clairmont case, commenting upon the Dick case, says: "While the Dick case was thus found, owing to the stipulation in the agreement, to be within the exception, the court explicitly recognized the rule which governs in the absence

of a different provision by treaty or by act of Congress. The court said: 'If this case depended *alone* upon the federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country, we should feel obliged to adjudge that the trial court erred in not directing a verdict for the defendant; for that statute, when enacted, did not intend by the words 'Indian country' to embrace any body of territory in which, at the time, the Indian title had been extinguished, and over which and over the inhabitants of which (as was the case of Culdesac) the jurisdiction of the state, for all purposes of government, was full and complete. (*Bates v. Clark*, 95 U. S. 204, 24 L. ed. 471; *Ex parte Crow Dog* (*Ex parte Kang-Gi-Shun-Ca*), 109 U. S. 556, 561, 3 Sup. Ct. 396, 27 L. ed. 1030, 1032.)

"In the present case there was no provision, either in the treaty with the Indians, or by act of Congress, which limited the effect of the surrender of the Indian title. We have been referred to certain statements made by the representative of the United States in the course of the negotiations with the Indians which preceded their agreement, but these were of an informal character and cannot be regarded as qualifying the agreement that was actually made. The Indian title or right of occupation was extinguished, without reservation; and the relinquished strip came under the jurisdiction of the then territory, and later under that of the state of Montana. It was not 'unappropriated public land' or land 'owned or held by any Indian or Indian tribe.' . . . . ''

Said opinion concluded as follows: ''Our conclusion must be that the right of way had been completely withdrawn from the reservation by the surrender of the Indian title, and that in accordance with the repeated rulings of this court, it was not Indian country. The district court, therefore, had no jurisdiction of the offense charged, and the judgment must be reversed.''

In the case at bar, by an act of Congress approved May 8, 1890, 26 Stat. at L., chap. 199, p. 104, which was prior to the treaty with the Nez Perce Indians wherein it was agreed, among other things, that the United States should, for a

period of 25 years, prohibit the introduction of intoxicating liquors into the country then embraced within the boundaries of the Nez Perce Indian reservation, the government granted to the Palouse & Spokane Railway Company a right of way through the said Nez Perce Indian reservation and included within the right of way the point at which the homicide occurred, for the commission of which the appellant has been convicted of the crime of manslaughter. In said act it is provided: "That it shall be the duty of the Secretary of the Interior to fix the amount of compensation to be paid the Indians for such right of way, and provide the time and manner for the payment thereof, and also to ascertain and fix the amount of compensation to be made individual members of the tribe for damages sustained by them by reason of the construction of said road; but no right of any kind shall vest in said railway company in or to any part of the right of way herein provided for until . . . . the compensation aforesaid has been fixed and paid; . . . . Provided, that the consent of the Indians to said right of way and compensation shall be obtained by said railway company in such manner as the Secretary of the Interior shall prescribe before any right under this act shall accrue to said company."

Basing our conclusion upon the presumption that the railroad company had complied with the conditions above recited it appears that prior to entering into the treaty with the Nez Perce Indians whereby the United States undertook to prohibit the introduction of intoxicating liquors into the Indian country, as above mentioned, both the United States and the Nez Perce Indians had conveyed the land, upon which the homicide was committed, to the said Palouse & Spokane Railway Company, thereby extinguishing the Indian title, which brings this case in line with that of *Clairmont v. United States, supra,* wherein it was decided, as above quoted, that the land included within such right of way was not "Indian country." In the light of this authority we conclude that the homicide described in the information occurred within the jurisdiction of the state of Idaho, and

not of the United States, and that the state courts have juris-
diction to try the appellant and the federal courts have not.

This court has heretofore decided that the courts of the
state of Idaho have jurisdiction to try all criminal cases
arising within the former Nez Perce Indian reservation ex-
cept those pertaining to the introduction of intoxicating
liquor into the Indian country. (*State v. Lott,* 21 Ida. 646,
123 Pac. 491.)

There appears in the transcript in this case, in support
of the motion of the appellant for a new trial, the affidavit
of Clay McNamee, Esq., one of the attorneys for appellant,
wherein he states, among other things, that said trial began
on the 27th day of November, 1914, and ended about the
hour of four o'clock P. M., on December 1, 1914. Said
affidavit further recites:

"That on the afternoon of November 27th, 1914, after the
jury had been selected to try said cause, one of the jurors,
William Nixon, inquired of the judge of the court if the
jury, while being kept together and trying said trial, would
be allowed to have reading matter; that the court replied
to the jury that the members of the jury would be allowed
to procure as many magazines or other reading material as
they might desire; that at that time affiant objected to any
of the daily newspapers being given to the jury during the
trial of said cause or during their deliberation on their ver-
dict; that the judge of the said court then stated that if
any daily newspapers were allowed to be given to the jurors,
that any report concerning the trial of said Samuel Tilden
therein contained should be cut out of said papers or that
the members of the jury should not read any report contained
in said papers of said trial or the proceedings had therein."

Said affiant further states in his affidavit that he has been
informed, since the discharge of the jury, that a certain
daily newspaper, in said affidavit named, of November 28th
and 29th, respectively, to the extent of one or more copies,
was allowed to be had by members of the jury; that said
paper is published in the city of Lewiston. Accompanying
the affidavit is an exhibit alleged to consist of a copy of

articles purporting to be statements of the proceedings in said trial, together with comments as to the merits of the case, appearing in said newspaper on said dates. These purported newspaper articles will not be here quoted at length, but there has been selected therefrom the following:

"Jackson, who was a very popular young Indian, died the day following the shooting, but made the following statement when it was realized he could not survive:

" 'On May 6, 1914, about 10 o'clock P. M., I, together with Joseph White, Harrison Jabes, Benjamin Wilcox, Charles Rogers, Albert Davis, Calaf Carter, Peter Types and others, was on my way from Pullman, Wash., where we played baseball, and on coming to Joseph, Idaho, one Samuel Tilden, did, without any excuse, shoot me in the side. Without any words and as I passed the said Samuel Tilden he struck me over the head with his gun. At this I tried to take the gun away from him for fear he would shoot someone, and he then shot me in the side. I had no whisky on my person and no one else did that I know of. Samuel Tilden did search all the boys for whisky, but found none, and this I believe is what made him shoot.'

"This statement was corroborated at both the inquest and preliminary examination by numerous witnesses and so Tilden was held for trial on the murder charge."

Said affiant further states in his affidavit that he is informed and verily believes that different members of the jury read the reports contained in said issues of said paper during the progress of the trial and were thereby biased and prejudiced against said defendant while deliberating upon their verdict in the above-entitled cause.

In support of the motion for a new trial the affidavit of J. V. Le Clair, one of the members of the said jury, was submitted to the court, in which he states; that during the course of the trial the members of said jury, on the 28th and 29th days of November, were permitted by the jury bailiff to have and to read one or more copies of said newspaper.

Counsel for respondent, commenting upon the manner in which this matter is brought before the court, says:

"First, the record fails to show what order the court made in regard to allowing the jurors to have reading matter and newspapers before them. This hiatus in the record, and which should have been included in the bill of exceptions, is attempted to be remedied by an affidavit of counsel on motion for, a new trial. . . . . "

The affidavits and exhibits above mentioned were incorporated in the bill of exceptions, and it was stipulated by the county attorney and counsel for the appellant that the statement of case and bill of exceptions were true and correct, and the said bill of exceptions and statement of the case on motion for a new trial, including the said affidavits and exhibits, were settled and allowed by the trial court on the 24th day of February, 1915. In his order overruling and denying the motion for a new trial the court mentions the matters and papers taken into consideration by him in reaching his conclusion upon said motion, and among the papers so mentioned in said order appear the affidavits in support of the motion for a new trial.

We conclude, therefore, that the matter of the introduction into the jury-room of the said newspapers under the circumstances disclosed in said affidavits is fairly and properly before this court for consideration upon the appeal from the order overruling and denying appellant's motion for a new trial.

It is earnestly urged by counsel for the respondent that the showing made by appellant is insufficient upon this point, in that it has not been shown that any member of the jury read said newspaper article, in violation of the order of the court, or was influenced thereby in reaching a verdict, neither is it shown that the articles were not cut from the papers, in conformity with the order of the court, before they were given to the jury.

Since the court carefully instructed the jury to refrain from reading newspaper reports about the trial, and since he also instructed the bailiff to cut from any newspapers given to the jury such reports, it is very apparent that it would be difficult for counsel for the appellant to procure

from the members of the jury or the bailiff affidavits that they had violated these orders. It is equally apparent that it would have been an easy matter for counsel for the respondent to procure affidavits that such orders had not been violated, if, in fact, they had not.

It was incumbent upon counsel for the respondent, if the bailiff cut from the said newspapers the articles complained of, to have presented his affidavit, showing that fact, to the trial court in opposition to the motion for a new trial, and it was likewise incumbent upon counsel for the respondent to have presented the affidavits of the members of the jury showing that they had not read the articles complained of if they had not. The failure to do this raises a strong presumption that the newspapers, containing such articles, got into the possession of the jury while it had the case under consideration and that said articles were read by its members.

The law upon this point, as we view it, is clearly stated by Chief Justice Sharkey in the majority opinion of the court in the case of *Hare v. State,* 4 How. (Miss.) 187, as follows:

"To me it seems that the line of distinction is here so clearly drawn, that it is impossible to mistake it, and so fortified by reason as to place it beyond doubt. It is briefly this: If the purity of the verdict *might* have been affected, it must be set aside; if it could not have been affected, it will be sustained."

If the jury or any member of it, after having been selected and before reaching a verdict in this case, read the articles set forth in the exhibits attached to the affidavit, particularly the one hereinbefore quoted, it clearly appears to our minds that the judgment should have been arrested and a new trial granted. There is absolutely nothing in the record, aside from the newspaper article complained of, to indicate that William Jackson made a dying declaration. The solemnity of a dying declaration is such that juries are greatly impressed by them, and they are permitted to be introduced in evidence only when the foundation therefor

has been properly laid and are received and considered by the jury only under proper instruction from the court. In this case it does not appear that any dying declaration was made or was used at the coroner's inquest or preliminary examination, although the newspaper article states that one was made and indicates that it was so used and purports to quote it. The foundation for it was not laid, it was not in evidence and the defendant did not receive the protection of a proper instruction from the court to the jury relative to such a dying declaration which the court would have given had one been admitted in evidence.

It is very likely that if said newspaper containing said articles got into the hands of the jurors, the report of the trial upon which they were engaged received their immediate consideration and influenced them greatly to the prejudice of the defendant.

Counsel for respondent in their brief have cited the case of *United States v. McKee*, 3 Cent. Law J. 258, Fed. Cas. No. 15,683, and have quoted therefrom as follows:

"The third ground of the motion for a new trial is in respect to the newspaper article, and in the judgment of both of us, that was an improper article to be published when the jury was about to take the case under consideration, if it was intended it should be read by them. The courts, before they were disabled by act of Congress, treated all articles calculated to influence the result of a pending case, as contempts of their authority, and punished the writers of such articles accordingly. Now, that article cannot be read without showing that there was a bias, at all events, against the defendant. That is undeniable, and if there is good reason to believe that that article had been read by the jury, and had influenced their verdict, if it was shown here conclusively that it had been read by them, we might be obliged, though we would be otherwise satisfied with the verdict, on legal principles, and following established precedents in this regard, to give the defendant a new trial. I make these remarks, because it ought to be understood that all attempts to influence the public mind, and particularly to influence jurors when they

have a case, civil or criminal, before them, are improper; and, I think, when journalists, respectable journalists, understand this, they will act accordingly. But it is to be remembered in this case that we said to the jury, after having first prohibited the reading of papers: 'You may read papers containing a report of this trial, but you must not read any editorial comments or articles criticising the trial one way or the other.' It is in evidence that this article was published, but there is the affidavit of no juror or other person that it was ever read. Mr. Stevens, the bailiff, testifies that two copies of the paper were bought by the jury, but no witness stated that this article was ever read by a juror. Now, in view of the fact that we had cautioned the jury against reading such articles, and this article disclosed that it was an improper one by the very heading of it, shall we suppose that the jury disregarded their duty without any showing, or must we suppose that they did not? That is a matter that, if it were true, could have been shown by the affidavit of jurors, but there is no such affidavit; and on that ground we think that the motion for a new trial must fail, the same as the others."

The same case is quoted from even at considerable greater length than as above set out in a note to the text in Thompson and Merriam on Juries, p. 413. In said note, immediately following the excerpt quoted and relied upon by counsel for respondent, it is stated:

"This decision, it is believed, cannot be supported either by precedent or on principle. The able and humane judge who rendered it has been censured for mitigating the punishment of McKee to imprisonment in the county jail, instead of the penitentiary; his real fault was that he did not grant him a new trial. The case excited great interest. Reporters were present, representing the daily papers of the principal cities of the Union. A paper owned by the defendant himself was publishing a *verbatim* report of the trial. Under these circumstances, permission given to the jury to read newspaper reports of the trial was an extraordinary indulgence, whether regard be had to the rights of the govern-

ment or to those of the prisoner. It was scarcely possible that such reports would not exhibit the bias of their authors, and that they would not be accompanied by editorial comments which it would be impossible to keep from the jury. Under the peculiar constitution of the federal courts, no appeal or writ of error is allowed in a criminal case, and McKee had no opportunity to take the judgment of an appellate court upon this question. It can scarcely be doubted what the judgment of an appellate tribunal upon the question as there presented would have been.''

In case of *Palmer v. Utah & Nor. Ry. Co.,* 2 Ida. 315, 13 Pac. 425, the court, quoting from the case of *Knight v. Inhabitants of Freeport,* 13 Mass. 217, says: "We cannot be too strict in guarding trials by jury from improper influence. This strictness is necessary to give due confidence to parties in the results of their causes, and everyone ought to know that for any, even the least, intermeddling with jurors a verdict will always be set aside.''

Upon the showing made by appellant that the jury was permitted to read said newspapers, in the absence of a showing upon the part of respondent that the articles complained of had been cut therefrom, or that none of the members of the jury read said articles, the court should have arrested the judgment and granted a new trial.

In the bill of exceptions presented in this case there is brought to our attention the ruling of the court upon a question propounded to the witness Albert Davis on his cross-examination, which we will briefly discuss in view of the fact that this case must be remanded for a new trial.

It had been shown by a witness produced prior to the examination of the said Davis that the Indians who composed the party returning from Pullman to Joseph had in their possession and had drunk a quantity of intoxicating liquor, and the witness Davis, a member of the party, having testified upon cross-examination, "I came down with the ball team from Pullman, Washington, to Joseph,'' the following question was propounded to him:

"Q. Had you been drinking that evening?

"Objected to as incompetent, irrelevant, and immaterial, and not cross-examination; nothing asked about being to Pullman.

"Mr. McNamee: To show his mental condition.

"The Court: He is not here on trial or I would let you on your side of the case show it, just how much he did drink; but I hardly think it is cross-examination of this witness."

This ruling was erroneous. It is said in 40 Cyc. 2574, as follows:

"The fact that a witness was intoxicated at the time of the events concerning which he testifies bears upon his capacity for accurate observation and correct memory, and hence is proper to be shown and considered in passing upon his credibility, although it does not render him absolutely unworthy of credit, and it is proper to cross-examine a witness fully as to whether he was intoxicated at such time, although the intoxication of the witness at such time may be shown without first asking him whether he was intoxicated."

This seems to be a correct statement of the law. It is certainly proper to cross-examine a witness to an encounter, as to any facts showing his ability or lack of ability to properly observe, clearly understand, remember and relate what took place. The witness should have been required to answer the question.

The judgment is reversed and the cause remanded for a new trial.

Sullivan, C. J., and Budge, J., concur.