(No. 6680.   January 15, 1940.)

STATE, Respondent, v. DUNCAN McD. JOHNSTON, Appellant.

[98 Pac. (2d) 628.]

W. L. Dunn and Thos. M. Robertson, Jr., for Appellant.

J. W. Taylor, Attorney General, R. W. Beckwith, E. G. Elliott, Lawrence B. Quinn and D. W. Thomas, Assistant Attorneys General, for Respondent.

SUTTON, D. J.—The appellant Duncan McD. Johnston was by information of the prosecuting attorney of Twin Falls county, November 14, 1938, charged with murder in the first degree, and was by the verdict of the jury convicted of that charge December 10, 1938, and his punishment fixed at life imprisonment. December 14, 1938, a judgment of the court was entered accordingly and thereafter appellant moved for a new trial which motion was denied January 3, 1939. The appellant appeals from the judgment and order denying his motion for a new trial.

As a basis for the reversal of the judgment and order, the appellant makes eight assignments of alleged error. The assignments will be considered in inverse order.

By the eighth assignment it is charged the court erred in giving Instruction No. 17. The record discloses this instruction was given upon the request of the appellant. The error in it, if any, was invited by appellant and he cannot now be heard to complain of it. (*State v. Orr*, 53 Ida. 452, 24 Pac. (2d) 679.)

Assignment No. 7 charges the court erred in permitting the defendant to be impeached on immaterial matters, and folios 2333 to 2344 of the transcript are pointed out to support the charge. An examination of this portion of the transcript does show an inexcusable persistence on the part of the special prosecutor to pursue a line of improper cross-examination. It further discloses that each objection based upon that ground was sustained and that such special prosecutor was admonished to desist. As just stated, many of these questions were improper and should not have been asked; but, in the main, these were not prejudicial except possibly the questions asked concerning an alleged conversation

between the defendant and one Posner which were asked and answered without objection. So the most appellant can urge, with respect to these latter questions and answers, is that the prosecution failed to call said Posner or any other person to prove conversations which the questions infer had occurred between defendant and said Posner. Such practice on the part of the prosecution should not be indulged in. (*State v. Bush*, 50 Ida. 166, 295 Pac. 432; *State v. Copenbarger*, 52 Ida. 441, 16 Pac. (2d) 383; *State v. Boyatt*, 59 Ida. 771, 87 Pac. (2d) 992.)

Assignment No. 6, which charges the court erred in overruling defendant's motion for new trial, will be considered later.

Assignment No. 5 charges the court erred in admitting State's exhibits numbered 18, 23, 24, 28, 29, and 32 in evidence. These exhibits are made up of items of personal property identified as having been the property of, or in the possession of, the deceased immediately prior to the time of his death and alleged to have been found in the basement adjacent to defendant's place of business, accessible to and used by him. There was no error in the admission of these exhibits.

Assignment No. 3 charges the court erred in overruling defendant's objection to the witness Scheneberger testifying to matters he learned while acting as the attorney for defendant, for the alleged reason the same was a privileged communication between attorney and client; and by Assignment No. 4 it is charged the court erred in the admission of State's Exhibit No. 36, which it is alleged constituted a privileged communication between defendant and said Scheneberger. An examination of the record discloses the only communication between defendant and Mr. Scheneberger, except minor preliminary and incidental matters, was contained in State's Exhibit No. 36. This exhibit consists in part of maps or diagrams showing the location of certain merchandise in the place of business of the defendant belonging to other persons. The exhibit also contains certain written instructions and directions as to where such merchandise would be found

and with reference to the disposition thereof. The record further discloses that exhibit No. 36 was admitted without objection and upon the express statement the defendant had no objection. The assignment is without merit.

Assignment No. 1 charges the court erred in pronouncing judgment, for the reason there was insufficient evidence to warrant a conviction. This assignment is divided into six parts designated (a) to (f) inclusive. Subdivision (e) has been hereinbefore disposed of. Subdivision (f) reads: "Defendant's attorneys, appointed by the court, did not see that defendant had a fair trial." It would seem this is no proper part of the assignment in which it is inserted. Further, it is so general as to be insufficient as an assignment, in that it fails to point out any particular in which it is alleged the defendant's attorneys failed in the discharge of their duty. It is true that in argument before this court it was suggested said attorneys failed to make any argument to the jury.

"Ordinarily, the negligence or unskillfulness of counsel for a defendant in a criminal case is no ground for a reversal." (*State v. Jukich*, 49 Nev. 217, 242 Pac. 590, 595.)

It is conceivable a case might be presented, in which it would appear from the record a defendant had manifestly not had a fair trial by reason of the misconduct, negligence or incompetency of his counsel. In such a case the appellate court might very properly order a new trial; but no such condition is presented by this record.

It will not be necessary for us to consider the charge that the evidence is insufficient to warrant the conviction. We have concluded that a new trial must be ordered on other grounds, and it would, therefore, be improper for us to discuss or comment on the evidence disclosed by the record.

Finally, we are brought to Assignment No. 2 which charges the court erred in overruling the defendant's objection to the admission of hearsay testimony by the witness Gillette on redirect examination as to what one Mills had told him. The evidence in question is disclosed at folios 1317 to 1319 and is as follows:

"Q. Now on cross examination you were asked if you investigated what Mr. Mills—how he happened to write that letter—what did you find?

"A. We found Mr. Mills stated that on that Saturday—

"Mr. RAYBORN: We object to what Mr. Mills stated. He is a resident of this town and it would be hearsay.

"The COURT: No, you opened this matter up. The objection will be overruled.

"Mr. LARSON: We didn't inquire about the statements; we inquired about the letter, is all.

"The COURT: You may answer.

"A. Mr. Mills stated that on that Saturday night of May 21st at about 8:30 he came down the alley directly behind the Johnston Diamond Shop; that when he got just about opposite where that door enters out from that basement he observed a dark colored sedan parked there. He stated that he observed a man go to that car with a light colored canvas over his left arm and throw it,—throw it in the back seat and get in the car and start the motor. He stated he heard a voice say: 'Don't go too far and hurry back.' He stated after he read the morning paper regarding the discovery of this body at the Park Hotel stating it was covered up with a canvas he remembered that incident and for that reason wrote this letter to the Decker Jewelry Company."

It is essential, in the consideration of this assignment, that we examine the portions of the direct and cross-examination of the witness Gillette pertinent to State's Exhibit No. 44 and the exhibit itself. The witness Gillette testified for the State on direct examination:

"Q. I will ask you whether you ever received a letter from a Mr. Mills disclosing that the objects found could be found in the basement there?

"A. No, sir, I never received any letter describing anywhere I might find those jewels in the basement or aiding in any way in this investigation. I did receive a letter forwarded to me from the Decker Jewelry Company and later found out it was written by Mr. Mills.

"Q. Was that letter signed?

"A. It was anonymous; un-signed.

"Q. Did you later find out it was written by Mr. Mills?

"A. Yes.

"Q. Do you have that letter here?

"A. Yes, I have that letter in my pocket.

Letter, marked for identification State's Exhibit 44.

"Q. I will hand you what has been marked for identification as State's Exhibit 44, and ask you to look at that exhibit, Mr. Gillette; is that the exhibit you have just testified in regard to?

"A. Yes sir, that is it.

"Q. And is the letter which you have later found out was written by Mr. Mills?

"A. Yes sir.

"Mr. BABCOCK: I now offer in evidence State's Exhibit 44, so marked for identification, as State's exhibit 44.

"Mr. RAYBORN: We join with the State in asking that it be admitted.

"The COURT: It will be admitted without objection and so marked."

Letter, admitted in evidence as State's Exhibit 44, and so marked.

"Mr. BABCOCK: At this time I ask permission to read this to the jury.

"The COURT: You may proceed.

"Reporter's Note: Whereupon Mr. Babcock read State's Exhibit 44 to the jury."

State's Exhibit 44 is as follows:

On cross-examination, Gillette testified:

"Q. I understand that this letter which is marked as State's exhibit 44 was given to you by Mr. Decker; you so testified?

"A. It was forwarded to me by the Decker Jewelry Company of Salt Lake.

"Q. You did'nt find the letter in the basement, then?

"A. No.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. This letter was delivered to you, you think, on the 26th of the month?

"A. Yes, it came in my mail on the 26th.

"Q. Did it occur to you it was a little unusual that some man would write a letter like that?

"A. Not under the circumstances in this case.

"Q. You, of course, was investigating the case at that time?

"A. Yes.

"Q. You were willing to run down any leads you might receive?

"A. Yes.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. You had received this letter at that time?

"A. What letter?

"Q. Exhibit 44?

"A. Yes.

"Q. After you received that you knew exactly what to do and where to go?

"A. That is wrong.  That letter had no value whatsoever in this investigation.

"Q. Had no value?

"A. Not in the least.

"Q. Was you not the least bit concerned to find out where Mr. Mills got his information?

"A. We interviewed Mr. Mills and found out who he had under suspicion."

The evidence pointed out by the assignment was clearly hearsay, therefore incompetent and should not have been admitted.  True, State's Exhibit 44, admitted upon the joint request of the State and the defendant, was even more incompetent; and it is a fair assumption that had it not been for

defendant's participation in the admission of that exhibit and his cross-examination of the witness Gillette with reference to it, the error complained of could not and would not have occurred. However, it can hardly be said the defendant thereby waived his right to seasonably object to the admission of other incompetent evidence. He was not entirely blameless, but his part in the matter falls short of invited error.

It is true ''A witness may be interrogated upon redirect examination as to any inferences shown by cross-examination, giving explanations, reasons and motives surrounding or connected with the doing or omitting to do a particular thing.'' (*State v. Fox,* 52 Ida. 474, 486, 16 Pac. (2d) 663.) But this rule does not entirely supersede the fundamental rule against the admission of hearsay; neither does it deprive one accused of crime, of the fundamental right of confronting the witnesses against him and testing their evidence by cross-examination.

Having determined the evidence in question was erroneously admitted and the error not invited, the further question arises, Was the error prejudicial to the rights of the defendant? In seeking an answer to this question, it must be borne in mind the conviction of the defendant rests entirely upon circumstantial evidence; that, among those circumstances, it appears:

That the body of the deceased was found covered with a light colored canvas in a dark blue sedan, locked and parked on one of the streets in the city of Twin Falls shortly before noon on the 24th day of May, 1938; that the body had been dead approximately three to four days; that the cause of death was a bullet wound in the back of the neck at the base of the skull; that among other things, there was found in the car an exploded automatic 25-caliber shell; that the bullet was from a 25-caliber gun; that thereafter a 25-caliber automatic pistol, alleged to have been the property of the defendant, together with the deceased's key-ring and chain, to which was attached the keys to said car and certain other articles of personal property shown to have been in the possession of the deceased shortly before noon May 21, 1938, were found cached at various places in the basement adjacent to defend-

ant's place of business and used by him; that it was afterward determined that the exploded 25-caliber automatic shell found in said car had been fired in said pistol.

The jury may have accepted the hearsay evidence in question as a statement of fact and may have regarded such facts as links in the chain of circumstances connecting the defendant with the death of. the deceased. If so, the admission of this hearsay testimony was highly prejudicial. This court in the case of *State v. Tilden,* 27 Ida. 262, 147 Pac. 1056, in effect said, " 'If the purity of the verdict *might* have been affected it must be set aside; if it could not have been affected it will be sustained.' "

When all the facts and circumstances as disclosed by the record in this case are weighed and considered, it seems it may not only fairly be said the defendant may have been prejudiced by the admission of the testimony in question, but, that he was probably prejudiced by its admission and therefore did not have a fair trial. And for that reason, the judgment and order are reversed and the cause is remanded with instructions to grant appellant a new trial. A new trial is ordered.

Ailshie, C. J., Givens and Morgan, JJ., concur.

HOLDEN, J., Dissenting.—Appellant joined the State in offering the Mills letter in evidence. By means of that letter the jury were told where Mills was sure the missing jewelry would, upon investigation, be found—the basement of the "Johnson Jewelry"—the identical place where the officers later actually found the jewelry. After the letter had been admitted in evidence and read to the jury, appellant, on cross-examination, asked Gillette if he was "not the least bit concerned to find out where Mr. Mills got his information." In effect, appellant thereby asked Gillette if the letter had not, to say the least, created sufficient interest in the matter to cause him (Gillette) to take steps to "find out where Mr. Mills got his information" as to the whereabouts of the jewelry; in other words, "how he (Mills) happened to write that letter."

The redirect examination by the State was not only directly connected with but answered that question—the answer being that on Saturday night, May 21st, about 8:30 Mills went "down the alley directly behind the Johnston Diamond Shop; that when he got just about opposite where that door enters out from that basement he (Mills) observed a dark colored sedan parked there;" that he, Mills, "observed a man go to that car with a light colored canvas over his left arm and throw it,—throw it in the back seat and get in the car and start the motor"; that Mills "stated he heard a voice say: 'Don't go too far and hurry back' ''; that he (Mills) stated "after he read the morning paper regarding the discovery of this body at the Park Hotel stating it was covered up with a canvas, he (Mills) remembered that incident *and for that reason* wrote this letter to the Decker Jewelry Company." (Italics mine.)

The thing, then, that prompted Mills to write the anonymous letter, that is to say, the *reason* he wrote it, or stated differently, "how he happened to write" it, could not have been given without stating what Mills told Gillette he (Mills) saw and heard that Saturday night. Where and how "Mills got his information" as to the whereabouts of the missing jewelry was so directly connected and interwoven with the "reason" and "how" and "why" Mills happened to write the letter telling the Decker Jewelry Company exactly where the jewelry could be found, as to be inseparable. Gillette did not testify he was familiar with Mills' handwriting and that the hand which penned the anonymous letter was Mills', and Mills was not called as a witness for either the State or appellant; therefore, it was all hearsay—even that Mills wrote the letter. Notwithstanding that, and as above pointed out, appellant joined the State in asking that the "hearsay" letter be admitted (no doubt believing it would help him rather than the State, in which belief, it seems, he was mistaken). The trial court for that reason admitted the letter in evidence when, otherwise, that is to say, if appellant had objected to its admission on the ground it was hearsay, as it unquestionably was and is, the court, of course, would have promptly re-

fused to admit it in evidence. Immediately following the admission of the letter, appellant cross-examined Gillette as to how Mills got his "information" as to where the jewelry could be found; consequently, appellant, having participated in putting the "hearsay" letter in evidence, and having, in effect, asked Gillette as to whether he had taken any steps to ascertain "where Mills got his information" as to where the missing jewelry could be found, invited the redirect examination made by the State and now complained of.

Moreover, it is well settled that "a witness may be interrogated upon redirect examination as to any inferences shown by cross-examination, giving explanations, reasons and motives surrounding or connected with the doing or omitting to do a particular thing." (*State v. Fox*, 52 Ida. 474, 486, 16 Pac. (2d) 663; *King v. Hahn*, 40 Ida. 555, 234 Pac. 937; *Smith v. Mine & Smelter Supp. Co.*, 32 Utah, 21, 88 Pac. 683; *Commonwealth v. Hughes*, 183 Mass. 221, 66 N. E. 716; *State v. Wong Wen Teung*, 99 Or. 95, 195 Pac. 349; *People v. Klopfer*, 61 Cal. App. 291, 214 Pac. 878; *Ellis v. Mansfield*, 215 Mo. App. 292, 256 S. W. 165; *Goldberg v. United States*, (C. C. A.) 295 Fed. 447; *Clark v. United States*, (C. C. A.) 265 Fed. 104; *Davis v. State*, 25 Ga. App. 532, 103 S. E. 819; *State v. Kendall*, 200 Iowa, 483, 203 N. W. 806; *Davis v. Allen*, 199 Ky. 442, 251 S. W. 194; *Mahoney v. Gootch*, 246 Mass. 567, 141 N. E. 605; *State v. McCormack*, 93 N. J. L. 287. 107 Atl. 475; *State v. Hempke*, 121 Wash. 226, 209 Pac. 10.)

Furthermore:

"Upon redirect examination it is proper to permit the witness to state facts and circumstances that tend to correct or repel any wrong impressions or inferences that might arise on the matters drawn out on cross-examination." (*Myers v. Rose et al.*, 27 Cal. App. (2d) 87, 80 Pac. (2d) 527, 528. See also: *People v. Corey*, 8 Cal. App. 720, 725, 97 Pac. 907; *State v. Dunkley*, 85 Utah, 546, 39 Pac. (2d) 1097, 1110; *State v. Rafferty*, 145 Kan. 795, 67 Pac. (2d) 1111, 1113.)

The redirect examination of the witness Gillette explained the reason Mills wrote the anonymous letter to the Decker Jewelry Company; hence, was proper under the rule first

above quoted. The redirect examination was also proper in that it tended to correct certain wrong impressions which arose from the matters drawn out on cross-examination.

I think the judgment of conviction should be affirmed.