(No. 6863. February 25, 1941.)

STATE, Respondent, v. DUNCAN McD. JOHNSTON, Appellant.

[113 Pac. (2d) 809.]

ON REHEARING JUNE 4, 1941

W. L. Dunn and T. M. Robertson, Jr., for Appellant.

Bert H. Miller, Attorney General, J. R. Smead, Assistant Attorney General, J. W. Taylor, former Attorney General, R. W. Beckwith, former Assistant Attorney General, and Edward E. Babcock, attorneys for Respondent.

MORGAN, J.—Appellant was charged with having

shot, killed and murdered George Olson, in Twin Falls County, Idaho, on or about May 21, 1938. Heretofore the case was before us on appeal, and a judgment of conviction was reversed and a new trial ordered because of error in the admission of evidence. (*State v. Johnston,* 61 Ida. 87, 98 Pac. (2d) 628.) A new trial was had, which resulted in the conviction of appellant of murder of the first degree, and the jury fixed his punishment at imprisonment in the state penitentiary for life. Judgment was entered accordingly, and the case is here on appeal therefrom.

Appellant assigns as error the action of the court in pronouncing judgment against him, and insists the evidence is insufficient to sustain the judgment, in a number of particulars, among which are that the *corpus delicti* was not established; that the evidence fails to show the body, claimed by the state to be that of George Olson, is, in fact, his body; that it has not been shown when death occurred, nor how it was produced; that it has not been proven where the murder was committed, if one was committed, and that the venue of the crime has not been established; that the evidence fails to prove Olson met death by a criminal agency, and fails to connect appellant with his death.

George Olson was a traveling jewelry salesman, representing Decker Jewelry Company of Salt Lake, Utah. It was his business to call on the retail jewelry dealers throughout his territory, including southern Idaho, in the interest of his employer and, in so doing, he carried goods and samples of considerable value. Among his customers was appellant herein, who was engaged in the retail jewelry business in Twin Falls.

The record shows appellant had, for some time prior to May 21, 1938, been indebted to Decker Jewelry Company in a substantial amount of money; that about a month prior to that date he made a partial payment of his indebtedness and, May 21, 1938, paid to Olson, for the company, $763.30, in cash, taking his receipt therefor, and leaving an unpaid balance, due from appellant to Decker Jewelry Company, of several hundred dollars.

June 1, 1938, the chief of police of Twin Falls had a

conversation with appellant, in the sheriff's office in the presence of the sheriff of Twin Falls County, with respect to what occurred between Olson and appellant on the occasion of the last visit of the former to Twin Falls. It appears, from the testimony of the chief of police, Johnston stated Olson came into his store about four o'clock in the afternoon of May 20, 1938, and left his trunks; that he was in and out of the store until about 5:15; that it was arranged between them to meet at the store at 8:00 o'clock p.m., which they did, and went from there to the Italian Gardens and had a couple of drinks; that thereafter Olson drove appellant back up town and he saw no more of Olson on May 20. The chief of police further testified appellant stated he came down to his store about nine o'clock the morning of May 21 and Olson was waiting there to see him; that they talked business for sometime; that he had some merchandise there on consignment from Decker Jewelry Company; that Olson figured up how much he owed, and, about 9:30, he paid Olson $763.30, in cash. He further testified appellant said he paid Olson five one hundred dollar bills, four fifty dollar bills and the rest in smaller money, totaling $763.30; that he accumulated the money over a period of about three weeks to a month from his sales in business, and that he received two of the fifty dollar bills and three of the hundred dollar bills [in exchange for money of smaller denomination] "from the light complexioned fellow in the center cage at the Fidelity National Bank." He stated he had received two one hundred dollar bills from Mr. Groves at the Bank & Trust and two fifty dollar bills he had received from his business during—over that period of time."

The chief of police further testified appellant stated Olson went outside the store and got into his car; that he, appellant, went on an errand and came back about ten o'clock and observed Olson sitting in his car asleep; that he went over to the car, woke Olson and got in the car with him; they talked a few minutes and then Olson suggested they go to the gasoline station and get some gasoline; that he went with Olson to the gasoline station and they both sat in the front seat and did not get out of

the car; that Olson presented a credit card for the gasoline; that the attendant washed the windshield but that was all. He did not vacuum out the car or perform any other service; that after buying the gasoline Olson drove him back in front of his store and left him. Appellant further stated to the chief of police that shortly before 11:30 George Olson walked into the store, picked up his brief case and diamond sample case and walked out of the front door, saying, "I'll be seeing you Johns," and that was the last time he ever saw him.

In the forenoon of May 24, 1938, a dead human body, covered with canvas, was found, between the front and rear seats, in a locked automobile, in the city of Twin Falls, Twin Falls County, Idaho. An exploded .25 caliber shell, but no firearm, was found in the automobile. The automobile windows were closed, and the keys were not found in or about it. A .25 caliber bullet was extracted from the neck of the corpse. Two physicians, who examined the body the day it was found, each testified, in his opinion, it had been dead three or four days; that death was caused by a gunshot wound in the back of the neck; that it was instantaneous, or occurred within a very few minutes, at most, after the shot was fired.

The clothing on the body was identified as that of George Olson. Among the papers found in one of the pockets was a duplicate receipt and invoice issued to him, dated May 21, 1938, showing he had purchased from J. H. Ramsay, 13.7 gallons of gasoline. The part of the document which constitutes the receipt is: "Goods Received [signed] Geo. Olson Purchaser." Ramsay testified Olson came to his service station about 11:00 o'clock A.M., May 21, 1938, and purchased 13.7 gallons of gasoline, which filled the tank.

An upper plate was found in the mouth of the body, which was identified by a dentist, who testified he made it, as having been made for George Olson. Max Williams, who testified he was Olson's brother-in-law and knew him well, viewed the body and identified it. He also identified the automobile in which the body was found as belonging to Olson.

Lucile Bagley, a witness called by appellant, testified

she knew Olson; that she met him the night of May 21, 1938, between 10:30 and 11:30 o'clock, at a carnival in Twin Falls; that she spoke to him and he spoke to her. No witness testified to having seen Olson alive after that.

Elmer Roush, an employee of the Park Hotel, in Twin Falls, called by appellant as a witness, testified he noticed a Ford sedan at the side entrance to the hotel the morning of May 24, 1938; that it was through his observing it the officers were called and the investigation made. That was Tuesday morning, the day on which the body was found. He further testified he first noticed the automobile there Sunday morning, about five o'clock, and did not notice it Monday.

The record shows the cap to the gasoline tank of the automobile was missing and the tank was nearly full. It also shows, when the body was found, a large amount of blood was in the bottom of the automobile; that a wrecker was called and the automobile was taken from the place it had been found to the police station where the corpse was removed from it; that when the wrecker lifted the front of the automobile a considerable quantity of red fluid poured from it.

Olson was last seen alive in Twin Falls County. His dead body was discovered in Twin Falls County and there is no evidence tending to show he was absent therefrom between the time he was last seen alive therein and the time his corpse was found. The proven facts and circumstances establish the venue in Twin Falls County; the identity of the body, and the *corpus delicti.*

Venue and *corpus delicti,* like other facts, may be established by direct testimony, by circumstantial evidence, or by both. (*State v. Brassfield,* 40 Ida. 203, 232 Pac. 1; *State v. McLennan,* 40 Ida. 286, 231 Pac. 718; *State v. McClurg,* 50 Ida. 762, 300 Pac. 898; *State v. Vanek,* 59 Ida. 514, 84 Pac. (2d) 567; 23 C. J. S. 172.)

The testimony shows that, during the early hours of June 1, 1938, there was discovered, concealed in the part of the basement to which appellant had access, and which was used by him, five hundred fifty-seven rings, of the estimated retail value of $15,000, wrapped in one of the towels furnished by a laundry service to business houses

in Twin Falls, including that of appellant. These rings were identified as being the property of Decker Jewelry Company and a part of the stock carried by Olson and in his possession when he left Salt Lake.

It further appears appellant visited the basement on the morning of June 2, 1938, and, while there, stopped and carefully looked at a place in the floor at or near a point where the concrete was broken; that while in the basement he discovered a policeman, who was on duty there, and who immediately took appellant into custody. June 3, a careful search was made and there was found concealed under the concrete walk, near the point where appellant had been seen looking at the floor, a towel, like the one above mentioned, and wrapped therein was a .25 caliber automatic Colt pistol and two automobile keys on a ring with metal chain attached. These keys fitted the locks of the automobile in which the corpse was found, and the empty shell found in the automobile was shown to have been exploded in the pistol found in the basement. That pistol was identified by the chief of police who testified he had worked on it, at the request of appellant, about three years before it was found in the basement. He was corroborated by police officer McCracken, who identified the gun as being one he assisted the chief in working on. Appellant denied the gun introduced in evidence was the one he had asked the chief of police to repair, and testified he had sold the one the officers worked on to an old gold buyer.

There was also found buried with the gun and keys, an envelope on which was printed:

"DUNCAN McD. JOHNSTON
Jeweler
Twin Falls, Idaho"

The envelope contained two rings identified as being the property of Decker Jewelry Company and in possession of George Olson when he last left Salt Lake. There was also found, concealed in the basement, the top and metal parts of a diamond case, and a ring tray, identified as parts of the case in which Olson carried rings.

Morris Posner testified to a conversation he had with appellant, in the courthouse, about the first of July, 1938, as follows:

"Why, we talked about the seven-hundred and sixty some odd dollars he said he had given to George Olson and he told me he had gotten that money by making a loan on his insurance and on his automobile. That was the money he had turned over to George Olson. Also he tried to recall to my mind that I was in the store and knew some facts concerning his giving a gun to George Olson, which I did not remember and also the fact that he had given George Olson keys to the store and myself also, which I didn't know about any of them.

* * *

"Q. Did he, during that conversation, ask you to make any depositions or affidavits of those facts he related?

"A. Oh, yes— * * * Yes, he did.

"Q. I will ask you, did you ever have a key to Mr. Johnston's Diamond Shop?

"A. No sir, at no time. * * *

"Q. Were you ever present when the defendant gave a gun to George Olson?

"A. No sir. May I add some more things to that conversation?

"Q. Yes.

"A. Mr. Johnston also told me at that time that a woman who ran a hotel over what used to be his store told him George Olson had been in her hotel the night previous and shown her a gun saying he was going to commit suicide.

"Q. Is that the substance of the conversation you had?

"A. Yes, that's all the substance of the conversation I had with Mr. Johnston."

The pistol found in the basement was sent by the officers to the Federal Bureau of Investigation for examination and report. U. N. Terry testified he had talked to appellant at the courthouse in August, 1938, and, during the conversation, appellant told him, "relative to the gun that had been sent back to the F.B.I., that it might have his finger-prints on it, that he had taken it down the day be-

fore Mr. Olson disappeared and had given it to Mr. Olson."

Appellant disputed the testimony of Posner and Terry, as he did that of a number of other witnesses called by respondent. These disagreements presented questions for the jury. Where, as in this case, the evidence tending to support a verdict is sufficient to sustain it, the judgment will not be reversed because of conflict in the testimony. (*State v. Thomas*, 47 Ida. 760, 278 Pac. 773; *State v. Brown*, 53 Ida. 576, 26 Pac. (2d) 131; *State v. Hargraves*, 62 Ida. 8, 107 Pac. (2d) 854; *Fruitland State Bank v. Lauer*, 34 Ida. 272, 200 Pac. 127; *Jones v. Mikesh*, 60 Ida. 680, 95 Pac. (2d) 575.)

F. C. Sheneberger, a witness called by respondent, testified he was an attorney-at-law and resided in Twin Falls; that he was attorney for apellant, as trustee in the Harry M. Slatkin bankruptcy proceedings; that the bankrupt's estate consisted of a stock of jewelry, luggage, used musical instruments and guns; that on or about June 5, 1938, he went to see appellant, at the courthouse, for the purpose of making arrangements for segregating part of the Slatkin stock of merchandise from appellant's merchandise in the Johnston Diamond Shop; that a part of the Slatkin merchandise was then located in the diamond shop; that when he visited appellant he was acting in his capacity as attorney for the trustee; that he received instructions from appellant, both oral and written. The witness identified two sheets of paper, on which were drawn diagrams, or plats, of some of the furniture and fixtures in the diamond shop. On the paper was written instructions whereby appellant sought to enable Sheneberger to locate certain articles of merchandise which he represented were the property of the Slatkin bankrupt estate. Among these articles were two watches which respondent contends did not belong to the bankrupt estate, but were in Olson's possession a short time before May 21, 1938.

Counsel for appellant objected to the introduction of the plat, and to oral evidence of the conversation had with Mr. Sheneberger, on the ground that both the oral and written evidence constituted confidential communi-

cations between attorney and client, within the meaning of I. C. A., sec. 16-203, which provides:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person can not be examined as a witness in the following cases:

\* \* \*

"2. An attorney can not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment."

Respondent insists, and cites numerous authorities to support its contention, that:

"Client's communications to attorney to be privileged must have been communicated in confidence, and where the communication is one authorizing or instructing the attorney to perform some act, it is not a privileged communication."

It further contends appellant did not fully and fairly communicate the truth to his attorney, when he represented the watches belonged to the Slatkin estate, nor his real object in desiring their removal from his shop; that under such circumstances the communication was not made in confidence, and was not privileged; also, that where the purpose really sought to be accomplished by the client was, itself a crime, (I. C. A., sec. 17-920) there could be no privilege attached to the communication. Further, that had the communication been with relation to the business of the bankrupt estate only, it was not privileged, because Mr. Sheneberger was not only attorney for the trustee in bankruptcy, but owed a duty, as such attorney, to the bankrupt estate and the bankruptcy court.

 We do not find it necessary to decide whether the evidence, documentary and oral, constituted a confidential communication between attorney and client. Appellant was sworn in his defense and testified to the same state of facts, and with respect to the same exhibit, as was testified to by Mr. Sheneberger. In *State v. Reding*, 52 Ida. 260, 266, 13 Pac. (2d) 253, 255, we said:

"Error, if any, in admitting irrelevant or improper

testimony is harmless where the fact which is intended to be proved thereby is fully shown by other evidence which was introduced previously or subsequently without objection. (17 C. J. 322, sec. 3664; *State v. Martinez*, 43 Ida. 180, 250 Pac. 239; *State v. Clark*, 47 Ida. 750, 278 Pac. 776; *State v. McClurg, supra;* 8 Cal. Jur. 616, sec. 599 (note 7); *State v. Wilson*, 51 Ida. 659, 9 Pac. (2d) 497, 499.)"

We adhere to that rule.

█ A. C. Parker was a witness at the first trial, and died before the second trial of the case. A request was made at the second trial for permission to read his testimony to the jury. An objection was made, by counsel for appellant, who urged that the testimony given at the former trial was not the best evidence because there were available witnesses who knew the facts testified to by Parker. The record shows Parker, the chief of police and another police officer, went to the basement in the building where appellant's jewelry store and shop was located, June 3, 1938, about ten o'clock in the forenoon; that shortly thereafter the chief of police went upstairs and the other officer was engaged in making an investigation of the furnace room in the basement. Parker, while alone, excavated under the sidewalk in the basement and discovered the towel containing the pistol and automobile keys, whereupon the chief of police and the other officer were called and Parker removed the towel, pistol and keys and the envelope containing two rings. It was possible to call other witnesses, and they were called, to prove what took place after their arrival at the point of discovery, but no witness was available to testify to the actual discovery of the cache. There was no error in allowing the testimony of the deceased witness to be read to the jury.

█ █ The testimony of a deceased witness, given at a former trial, may be read as evidence at a subsequent trial between the same parties and involving the same issues. (*State v. Brassfield*, 40 Ida. 203, 232 Pac. 1; *State v. Ward*, 51 Ida. 68, 1 Pac. (2d) 620.)

Appellant has specified numerous errors which we have not discussed, but we have very carefully examined them

and find them to be without merit. The judgment is affirmed.

Givens, Acting Chief Justice, Holden and Ailshie, JJ., and Sutton, D. J., concur.

Budge, C. J., deeming himself disqualified, did not sit with the court at the hearing nor participate in the decision.

## ON REHEARING
## (June 4, 1941)

MORGAN, J.—Appellant filed a petition for rehearing, which was granted, and the case has been reargued and resubmitted to the court for decision. After careful consideration of all matters presented on rehearing, we adhere to the decision heretofore announced, affirming the judgment appealed from.

Givens, Acting Chief Justice, Holden, Justice, and Sutton, District Judge, concur.

AILSHIE, J. (Dissenting)—A rehearing was granted in this case and since the reargument I have made a minute and detailed examination of the entire record, including the exhibits, and now, at the conclusion of this further consideration of the case, I am not willing to join in affirming the judgment. On the contrary, I feel that a new trial should be granted. I can not escape the impression that the defendant has not had a fair and unprejudiced trial and, in saying so, I do not mean to imply that either the trial court or officials have been guilty of misconduct in the trial of the case. It is, however, obvious from the face of the record, that a great mass of the so-called evidence in the case consists of hearsay, guessing, and, alleged conflicting or untrue statements made by defendant concerning wholly immaterial and collateral matters about which there could have. been no reason for defendant to either remember or make false statements.

Since the majority are affirming the judgment, there is

no reason, and could be but slight excuse, for me to review the case here or point out, in any further detail, my reason for concluding that a new trial should be granted.