537 P.2d 1369
The STATE of Idaho, Plaintiff-Respondent,
v.
Danny R. POWERS, Defendant-Appellant.
No. 11217.

Supreme Court of Idaho.
July 8, 1975.

Craig Marcus, Marcus & Marcus, Boise, for defendant-appellant.

W. Anthony Park, Atty. Gen., James P. Kaufman, Asst. Atty. Gen., Boise, for plaintiff-respondent.

McQUADE, Chief Justice.

In September, 1972, Danny Ray Powers (hereinafter appellant) was tried for the murder of William Butler, an inmate at the Idaho State Penitentiary. A jury found appellant guilty of murder in the first degree upon which a judgment was entered. It is from that judgment that this appeal was taken. We affirm the judgment of conviction.

On the night of August 14, 1971, the body of William Butler, who had been an inmate at the Idaho State Penitentiary, was found by prison officials rolled up in a floor mat against the wall in the gymnasium area of the prison. An autopsy conducted on the following day, disclosed that the cause of death was multiple stab wounds with massive hemorrhage resulting from one stab wound to the heart and massive head injuries. Appellant along with

fifteen other inmates at the Idaho State Penitentiary, old site, was moved to the maximum security unit at the site of the new penitentiary the day after Butler's body was found. The Ada County Sheriff's office was called in to investigate the murder, and questioned the inmates who were confined to the maximum security unit in the course of its general investigation.

On September 24, 1971, Paul W. Bright, Ada County Sheriff, received word that appellant wanted to talk to him. Sheriff Bright brought a tape recorder and visited appellant in his cell. Sheriff Bright testified that he asked appellant why he wanted to see him, and appellant said it was about the Butler murder. The Sheriff then said, "What about it?" and appellant replied, "Well, I done it." This exchange took place before the tape recorder was turned on, and before appellant was afforded his *Miranda* warnings.

Immediately thereafter, and before any other statements were made, appellant was apprised of his *Miranda* rights, which appellant stated that he understood. Appellant still wished to talk to the Sheriff, and made a statement confessing to the commission of the murder. At appellant's request, he was removed from the Idaho State Penitentiary and brought to the Ada County Sheriff's office the following day on September 25, 1971. Appellant made another statement, which was an elaboration of his first statement given the previous day, after again being afforded his *Miranda* rights and waiving them. On September 26, 1971, appellant made a final statement to the Sheriff, after again being read the *Miranda* warnings, which appellant acknowledged that he understood.

Appellant was jointly charged along with Ronald Macik and William Burt, for the murder of William Butler. A preliminary hearing was held on November 23, 1971. Following this hearing, appellant was held to answer in the District Court. On February 28, 1972, the Ada County Prosecuting Attorney filed an information charging the appellant with first degree murder. Appellant was arraigned before the District Court on March 2, 1972. At that time and before appellant entered a plea, appellant made a motion to strike the information on the ground that it was not timely filed. That motion was denied. On March 15, 1972, appellant filed an affidavit in support of a motion to change the venue, or in the alternative, to secure funds to conduct a survey in the community to ascertain whether a fair and impartial trial could be received in Ada County. He also filed another motion to strike the information. These motions were denied. On March 21, 1972, appellant filed a notice of his intent to rely upon mental illness as an affirmative defense. On April 21, 1972 the court appointed a duly qualified psychiatrist to examine the appellant and report upon his mental condition. On August 15, 1972, appellant filed a motion to suppress the statements made by him to the Ada County Sheriff. This motion was denied. A motion for judgment of acquittal based upon mental disease was filed pursuant to I.C. § 18–213 on September 8, 1972, upon receipt of the psychiatric evaluation of the appellant. The court denied this motion.

The trial began on September 11, 1972. The jury found the appellant guilty of murder in the first degree. Appellant filed a motion for judgment of acquittal and in the alternative for a new trial. Both of these motions were denied, and a judgment of conviction was entered. From that judgment this appeal was taken.

### I.

■ In his first two assignments of error, appellant argues that the trial court erred when it refused to grant his motion for a change of venue, on the ground that prejudicial news publicity prior to his trial made it impossible for him to receive a fair and impartial trial in Ada County. Appellant at trial accompanied his motion with affidavits from the Boise newspaper, television and radio media, attesting to the number of people who were exposed to stories

regarding the murder of William Butler. Also included in his motion were newspaper clippings, and verbatim transcripts of television and radio news accounts surrounding the Butler murder. We have reviewed the record, and find no abuse of the trial court's discretion in denying appellant's motion for a change of venue.

I.C. § 19–1801 provides for a change of venue in criminal actions where,

"* * * a fair and impartial trial can not be had in the county where the indictment is pending."

This Court has held on numerous occasions in construing this statute,

"* * * that the granting of a change of venue lies within the discretion of the trial court and where it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, refusal to grant a change of venue is not a ground for reversal." [1]

The news disseminated to the public through the media contained only dispassionate and objective factual accounts of the events that were then occurring. We fail to find any editorial comments or other opinions which gave rise to feelings of passion or outrage against appellant thus compromising his right to a fair trial.[2] Most of the news accounts that appellant alludes to, appeared almost a year before the date of his trial. Appellant makes no allegation nor is there any indication in the record that there was difficulty in impaneling a jury. The record as a whole, fails to show that he was not afforded a fair and impartial trial in Ada County.

## II.

In his assignments of error numbered three through eight, appellant contends that the trial court erred when it refused to grant him public funds to conduct a community survey, for the purpose of determining whether he could obtain a fair and impartial trial in Ada County. Appellant maintains that when the trial court refused to change the venue, it was under an affirmative obligation to grant funds necessary to poll the community. Appellant advances support for this position on two grounds. First, he believes that the failure of the trial court to allocate funds for the community poll, denied to him his right to the effective assistance of counsel as embodied in I.C. § 19–852(a)[3] and the 6th Amendment to the United States Constitution. Second, he insists that he was denied equal protection of the laws[4] since the county provides investigative assistance to those indigents who are represented by the Public Defender's office, but denied similar assistance to indigents who are represented by court-appointed private counsel as he was. Appellant was represented by private counsel because the Public Defender was forced to withdraw his representation due to a conflict of interest between appellant and another defendant. We do not agree with appellant's arguments.

An indigent defendant's right to counsel is the right to effective counsel.[5]

---

1. State v. Thomas, 94 Idaho 430, 432, 489 P.2d 1310, 1312 (1971); *See also* State v. Bitz, 93 Idaho 239, 460 P.2d 374 (1969); State v. Cypher, 92 Idaho 159, 438 P.2d 904 (1968).

2. *See* Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1965).

3. I.C. § 19–852(a) reads: "Right to counsel of needy person—Representation at all stages of criminal proceedings—Payment.—(a) A needy person who is being detained by a law enforcement officer, or who is under formal charge of having committed, or is being detained under a conviction of, a serious crime, is entitled:

(1) to be represented by an attorney to the same extent as a person having his own counsel is so entitled; and

(2) to be provided with the necessary services and facilities of representation (including investigation and other preparation). The attorney, services, and facilities and the court costs shall be provided at public expense to the extent that the person is, at the time the court determines need, unable to provide for their payment."

4. U.S.Const. Amend. XIV, § 1.

5. McMann v. Richardson, 397 U.S. 759, 771 ftn. 14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773 (1970).

This state has recognized that in certain instances appointing an attorney to represent a destitute defendant does not go far enough to safeguard this right. Statutory provision has been made to provide an impoverished defendant, in addition to a lawyer, " * * * the necessary services and facilities of representation (including investigation and other preparation). * * * "[6] This section was adopted from the Uniform Law Commissioners' Model Defense of Needy Persons Act. It recognizes that there may be cases where the right to counsel would be rendered meaningless, unless the lawyer has funds to provide the specialized aid which the case required.[7] Financial assistance is not automatically mandatory, but rather depends upon needs of the defendant as revealed by the facts and circumstances of each case. Before authorizing the expenditure of public funds for a particular purpose in an indigent's defense, the trial court must determine whether the funds are necessary in the interest of justice.

We have not been presented with, nor has our research unearthed any cases dealing with the allocation of funds to an indigent defendant for the purpose of conducting a community survey to determine whether a fair trial could be held. The cases cited in appellant's brief do not stand for that proposition. They deal with instances where the court felt that to deny the requested funds would be tantamount to preventing counsel from preparing a defense. That is not the situation in this instance.

■ Appellant claims that a survey was indispensible to establish the bias against him in the community. He asked the trial court to determine what sum would be appropriate to pay for a commercial survey firm. He did not submit a reasonable estimation of the costs of such a survey for the trial court's consideration. Appellant loses sight of the viable alternatives available to a defendant in a criminal prosecution which can evaluate the sentiment in a community without resorting to the public coffers. A defendant has the opportunity to present to the trial court all the material disseminated to the public which he feels instills in their minds such prejudice against him as to prevent an impartial trial.[8] He also has the opportunity to thoroughly examine each juror upon voir dire to ferret out bias and prejudice. We do not believe that a public survey could appreciably improve on the process as it now exists.

■ This brings us to appellant's equal protection argument. Appellant has not demonstrated that he has been treated differently from other indigent defendants similarly situated. I.C. § 19–861 authorizes a public defender to employ investigators and other persons as the board of county commissioners considers necessary. From this statute, appellant contends that the public defender has at his disposal investigative resources which are not similarly available to private court appointed counsel representing the indigent. While the Ada County Public Defender may utilize whatever investigative staff he may have been allotted without obtaining prior court approval, the availability of such staff is the result of appropriations of the board of county commissioners which places reasonable use restrictions thereon. It is fundamentally fair to require a showing by the indigent, represented by private court appointed counsel, that there is a necessity for allowance to employ investigators. The trial court's failure to appoint an investigator whom it deemed unnecessary to conduct a community survey to aid appellant's court appointed private counsel, did not violate the Equal Protection clause of the Fourteenth Amendment.[9]

6. I.C. § 19–852(a)(2).

7. *See* Bush v. McCollum, 231 F.Supp. 560 (N.D.Tex.1964), aff'd, 344 F.2d 672 (5th Cir. 1965).

8. *See* State v. Bitz, *supra* note 1; State v. Cypher, *supra* note 1.

9. *See* Mason v. Arizona, 504 F.2d 1345 (9th Cir. 1974).

### III.

Appellant's assignments of error ten through fifteen pertain to the trial court's refusal to apply Criminal Rule 7 to his case. The pertinent section of Criminal Rule 7 is subsection (e) which states:

"(e) *Filing of Information.* The prosecuting attorney must file an information within ten (10) days after an order is entered by the magistrate holding the defendant to answer in the district court, unless more time is granted by the court for good cause shown."

Appellant argues that pursuant to this rule, the information filed should have been stricken because it was not timely filed. Appellant maintains that a total of 97 days elapsed between the execution of the order committing him on November 23, 1971 and the filing of the information on February 28, 1972. Since the prosecution failed to show good cause for securing an extension of time in which to file the information, appellant argues that the information should have been dismissed. We cannot agree with appellant's contention.

▮ In 1971, this Court adopted the Rules of Criminal Practice and Procedure (I.C.R.), effective as of January 1, 1972. Criminal Rule 59 provides:

"*Rule 59. Effective Date.*—These rules shall take effect at 12:01 A.M. on the 1st day of January, 1972. They govern all criminal proceedings thereafter commenced and *so far as just and practicable* all proceedings then pending." [Emphasis added].

It is clear from the language set forth in the above quoted rule that the Idaho Rules of Criminal Practice and Procedure were to be applied to criminal cases pending before January 1, 1972, only when just and practicable to do so, i. e., when it would not work an unreasonable hardship on either the defendant or the prosecutor to apply them. There was to be no unqualified right to have these rules applied to all cases pending before the rules went into effect in January of 1972. Here, the trial judge determined that an application of I.C.R. 7(e) to this case would work an undue hardship on the prosecution.

### IV.

Appellant's assignments of error sixteen and seventeen pertain to the denial of his motion to suppress statements made by him to the Ada County Sheriff on September 24, 1971. Appellant advances two arguments to support his contention that his statements to the Sheriff were involuntary. First, he argues that when he was placed in maximum security the day following the discovery of Butler's body, he was in custody as a prime suspect. Therefore, appellant maintains that he acquired certain rights under I.C. § 19–853, namely the right to have the Public Defender informed of his detention and the right to have counsel represent him. Appellant maintains that denial of these rights taints the legality of his statements to the Sheriff. Second, appellant argues that his mental condition coupled with the psychological coercion produced by five and one half weeks of isolation in maximum security produced an involuntary confession which should not have been admitted into evidence at his trial.

Appellant was not detained for the commission of a serious crime within the meaning of I.C. § 19–853, when he was placed in maximum security along with 15 other inmates after Butler's body was discovered. I.C. § 19–851 defines detain to mean " * * * to have in custody or otherwise deprive of freedom of action." An inmate in a penal institution is in custody of prison officials, therefore is not free to move about as he might wish. This however, is not the sense in which the language found in I.C. § 19–851 was meant to be construed.

The definition of detention found in I.C. § 19–851 is an adoption of the language utilized by the United States Supreme

Court in Miranda v. Arizona.[10] In *Miranda*, the Court was concerned with the inherent coercive effect of a

> "* * * custodial interrogation, [by which] we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[11]

In a footnote, the Court explained that this was merely a restatement of the *Escobedo*[12] requirement that the investigation had focused on the accused.[13]

In this case, at the time appellant was moved to the maximum security wing of the state prison, the investigation had not focused on any single suspect. Appellant was one of sixteen people who were being investigated by prison officials. The Sheriff at that time had not fully developed the facts sufficiently to reach the accusatory stage of the investigation.

 The right to counsel as guaranteed by I.C. § 19–853, was meant to attach at the accusatory stage of the proceedings rather than the investigative stage. The intention of the Legislature can be seen in the heading of this statute wherein it provides for "acknowledgement by *accused;*" [emphasis added] and not by an individual being questioned in the course of a general investigative inquiry. At the time appellant and 15 other inmates were placed in maximum security, the case was still in its investigatory stage and not its accusatory stage. Therefore no violation of I.C. § 19–853 can be said to have occurred.

 Appellant argues that because of his mental condition, any confession made by him may not be considered voluntary and is therefore inadmissible. A confession is voluntary where it is "the product of a rational intellect and a free will."[14]

> "If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure * * *."[15]

To determine whether a confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be taken into account.[16]

 So long as the defendant is mentally capable of understanding the meaning and consequences of his statements, a mental disturbance will not necessarily preclude the admissibility of a confession.[17] Dr. Cornell, psychiatrist, who also examined appellant found him to have a dull normal I.Q., to be without neurosis, psychosis or any organic brain damage, to have the capacity to understand the proceedings against him, and to appreciate the wrongfulness of his conduct. Al-

---

10. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

11. *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

12. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

13. Miranda v. Arizona, *supra* note 10, 384 U.S. at 444 ftn. 4, 86 S.Ct. at 1612, 16 L.Ed. 2d at 706.

14. Blackburn v. State of Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 249 (1960).

15. Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770, 782 (1963).

16. Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) ; Fikes v. State of Ala-

bama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) ; Payne v. Arkansas, 356 U.S. 560, 567, 78 S.Ct. 844, 850, 2 L.Ed.2d 975, 980–81 (1958) ; Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L. Ed.2d 77, 79 (1968).

17. Criswell v. State, 86 Nev. 573, 472 P.2d 342 (1970), cert. den. in 400 U.S. 946, 91 S. Ct. 251, 27 L.Ed.2d 251 ; People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. den. in 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 ; People v. Hester, 39 Ill.2d 489, 237 N.E.2d 466 (1968), app. dism. in 397 U.S. 660, 90 S.Ct. 1408, 25 L.Ed.2d 642 ; State v. Ordog, 45 N.J. 347, 212 A.2d 370 (1965), cert. den. in 384 U.S. 1022, 86 S. Ct. 1942, 16 L.Ed.2d 1025 ; State v. Allen, 67 Wash.2d 238, 406 P.2d 950 (1965).

though appellant was found to suffer from a personality disorder which colored and affected his behavioral responses, the psychiatrist testified that,

"* * * we do not feel he has enough of this abnormality disorder of a gross amount to where it totally controls his whole—his whole responses."

When judged by the totality of the circumstances, appellant's confessions to Sheriff Bright were voluntarily made. Accordingly, they were admissible into evidence.[18]

Appellant argues that his confession was the result of psychological pressure and therefore was not voluntary. Appellant contends that he was placed in isolated maximum security for the sole purpose of overbearing his will, and that the fact that it took five and one-half weeks to obtain a confession is obvious evidence that the confession was involuntary.

There is no evidence in the record from which we can conclude that appellant was placed in maximum security along with fifteen others for any purpose other than to assist in the investigation of the Butler murder, and to restore order in the prison. The record indicates that the move was done for two purposes: first, it would make it easier for the Ada County Prosecutor to serve warrants, and second, it would aid in restoring the prison to normal routine. We fail to see how this move, which was made for bona fide investigatory and security purposes, exerted sufficient psychological coercion upon appellant, to render his statements to Sheriff Bright involuntary.

The circumstances surrounding appellant's statements to the Sheriff had none of the indicia of coercion that motivated the *Miranda* scrutiny of investigative methods.

"The evil against which the *Miranda* decision was directed was lengthy interrogation, employing psychological strategems designed to elicit inculpatory statements from criminal suspects who had not made an informed or knowing waiver of their right to remain silent and to be represented by counsel." [19]

It was appellant who arranged the meeting with Sheriff Bright at which time he voluntarily chose to speak about the Butler killing. Sheriff Bright properly informed appellant of his *Miranda* rights as soon as appellant indicated his intention to make a statement. These rights were knowingly waived. *Miranda* does not forbid spontaneous and uncoerced statements. Judged by the totality of the circumstances surrounding the confession, we cannot say that there was any psychological coercion which would render any statement made by appellant inadmissible.

V.

In his assignments of error numbered eighteen through twenty-two, appellant argues that he was not mentally competent to stand trial. Appellant contends that the testimony of Dr. Cornell, the examining psychiatrist, established that he suffered from a mental disorder or defect which prevented him from testifying on his own behalf. Appellant relies upon the following portion of the examining psychiatrist's report to substantiate his position.

"* * * that the defendant does have a capacity to * * * assist in his own defense providing that he is not placed on the witness stand. He is so overly reactive to his external environment and his own lack of inner strength that he could easily 'be led down the garden path' and portray an image that may not be necessarily factual."

Appellant maintains that if a person cannot testify in his own behalf because of a mental disease or defect, he cannot adequately assist in his own defense, and therefore cannot be tried. Appellant con-

18. For a confession to be admissible, it must have been voluntarily executed, State v. Hall, 88 Idaho 117, 397 P.2d 261 (1964).

19. State v. Dillon, 93 Idaho 698, 706, 471 P.2d 553, 561 (1970).

cludes by stating it is a violation of Idaho Code § 18–210, and a denial of due process to compel a defendant under such circumstances to stand trial. Appellant also cites as error the trial court's failure to suspend the proceedings against him pursuant to I. C. § 18–212, after it was determined that he was not competent to assist in his own defense. Since we find appellant competent to stand trial, and capable of assisting in his own defense, I.C. § 18–212 is inapplicable.

The test for determining competency was enunciated by the Supreme Court in Dusky v. United States [20] where the court held that the:

> " * * * 'test must be whether he [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him.' " [21]

That test, is equivalent to the standard set forth in I.C. § 18–210 which provides that:

> "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, sentenced or punished for the commission of an offense so long as such incapacity endures."

Thus to determine whether appellant was competent to stand trial we must inquire whether he had the capacity to (1) understand the proceedings against him and (2) assist in his defense.

Appellant does not contend that his mental defect impaired his ability to understand the proceedings. In fact Dr. Cornell in his written report stated that appellant had no problem understanding the proceedings against him when he said:

> "It is our opinion that the defendant does have a capacity to understand the proceedings against him * * *."

Appellant instead attacks the second prong of the incompetency standard under I.C. § 18–210. He contends that his inability to testify willingly in his own behalf, rendered him unable to assist in his own defense.

 It can be concluded from reading Dr. Cornell's report, that in his opinion, appellant would be an unsatisfactory witness who might be made to look bad when subjected to rigorous cross-examination should he choose to testify. Rather than assisting in his defense if he took the stand, appellant would more than likely hurt his case. Dr. Cornell testified that appellant lacked the inner or emotional strength to be an effective witness. This by itself does not render a defendant in a criminal case incompetent to stand trial, but is a decision which must be made by each defendant.

> "There are obviously varying degrees of ability to testify, to assist counsel or to understand the proceedings, and it is only when that inability is of such degree as to satisfy the standards of *Dusky* that a defendant is incompetent. A criminal trial is difficult for any defendant and it is quite conceivable in any case that a defendant will be so emotionally shaken that testifying will be very difficult. As we understand competency it is only if the defendant is mentally or emotionally incapable of testifying in a rational manner that he should be adjudged incompetent." [22]

The question of incompetence is one of degree.

> "Incompetency must be a relative judgment which takes into account the

---

20. 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed. 2d 824, 825 (1960).

21. *Id.* The Court in formulating this test was construing 18 U.S.C. § 4244. The language in that provision is very similar to that found in I.C. § 18–210.

22. United States v. Horowitz, 360 F.Supp. 772, 778 (E.D.Pa. 1973); See also United States v. Sermon, 228 F.Supp. 972 (W.D. Mo. 1964).

average level of ability of criminal defendants. Many defendants lack the intelligence or the legal sophistication to participate actively in the conduct of their defense. But enlarging the class of persons considered incompetent to stand trial to include all such defendants would fundamentally alter the administration of the criminal law. The standard of rational understanding emphasized in *Dusky* must be taken to mean no more than that the defendant be able to confer coherently with counsel and have some appreciation of the significance of the proceeding and his involvement in it. Many defendants who have some intellectual or physical handicap or emotional disturbance preventing them from functioning at their normal level of effectiveness can still meet such a standard. The question is one of degree; the purpose of the law is not to attempt to compensate all the inevitable disparities in innate abilities among defendants, but to identify those instances where the purposes of incompetency law are most directly relevant." [23]

We conclude that appellant had the requisite ability to participate effectively in his case and to assist in his defense.

## VI.

In his assignment of error numbered forty-nine, appellant argues that the trial court erred when it refused to grant his motion for a judgment of acquittal on the ground of mental disease or defect excluding responsibility. The motion was filed prior to the trial, and was based upon the report submitted by Dr. Cornell pursuant to I.C. § 18–211. A hearing was held at which time the motion was denied.

When the appellant moved for a judgment of acquittal under I.C. § 18–213, the trial judge was asked to determine whether appellant suffered from a mental impairment " * * * sufficient to ex-

clude responsibility, * * *." for the crime for which he was charged and confessed to committing. The trial judge had before him Dr. Cornell's report which was inconclusive on the subject. In his report Dr. Cornell stated:

"It is our opinion that the defendant can appreciate the wrongfulness of his conduct. * * * To answer whether he could conform his conduct to the requirements of the law at the time of the criminal conduct charged, scientifically, is very difficult for us to be very categorical about it. * * *"

This report clearly was insufficient to find insanity as a matter of law. Therefore no error was committed by the trial court in denying appellant's motion for acquittal.

## VII.

In his next major grouping of assignments of error, appellant argues that the trial court erred when it submitted to the jury the issue of his sanity at the time of the alleged commission of the criminal act for which he was charged. Appellant maintains that the testimony of Dr. Cornell created a doubt as to his sanity, thereby shifting the burden to the State to prove beyond a reasonable doubt that he was sane. Appellant contends that the State failed to sustain its burden of proof, and therefore a directed verdict of acquittal should have been granted in his favor.

The case most directly on point in answering appellant's arguments is State v. Myers.[24] There as in this case, the defendant relied upon expert testimony to put his sanity in issue. The defendant argued that this evidence established a reasonable doubt as to his sanity at the time of the alleged commission of the acts for which he was charged. He further asserted that this evidence was competent and unrefuted by the State's evidence, and that therefore the jury was not at liberty to disregard the testimony. He assailed the guilty verdict

23. Note, "Incompetency to Stand Trial," 81 Harv.L.Rev. 454, 459 (1967).

24. 94 Idaho 570, 494 P.2d 574 (1972).

of the jury claiming that it was not supported by the evidence, since a reasonable doubt of his sanity had been raised but was not controverted by the prosecution.

 The Court recognized in *Myers*, that before the State is put to the task of proving a defendant sane beyond a reasonable doubt, the defendant must first create a reasonable doubt as to his sanity at the time of the alleged commission of the criminal act. The jury's determination in *Myers* that the defendant had not raised the requisite doubt as to his sanity was not disturbed on appeal, although the defendant had introduced the testimony of two expert witnesses, whereas the State had introduced none. It was noted that psychiatry is not an exact science, and that psychiatric testimony is often inconclusive. That Court found that the jury *could* and obviously did reject the opinion testimony of the defendant's experts, which was inconclusive and inconsistent in many particulars. The opinion went on to say that there was competent evidence on which the jury could have based their determination that defendant was sane, and that therefore the jury's determination in that regard would not be reversed on appeal.

 In this case, Dr. Cornell, testified as follows regarding appellant's capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law at the time of the criminal conduct charged:

"I think of all of the sections of Section 18–211, Idaho Code, that probably this gives us more trouble than any because in the first place we do not know the person usually before a crime is committed, we usually aren't there at the time of the crime, and we usually see them some days later, so to handle the question of what degree of amount of impairment was present at the time of the criminal conduct charged is a pretty tricky one. It is one you almost have to hypothesize. You can perhaps have a better opinion on it if you knew what

was before, during and after, and even then there are many variants. We felt that he did appreciate the wrongfulness of his conduct even though he did not show the degree or evidence of guilt that you usually see. To answer whether or not he could conform his conduct to the requirements of the law at the time of the criminal conduct charged, we can say he shows evidence in his psychological testing of being impulsive and highly reactive to the environmental stress. He does lack internal control, it interferes with his being able to handle stimuli from the environment, and he may be temporarily overwhelmed. These factors of the reactivity to environmental stress and his lacking internal control were brought out mainly by the psychological testing and not from the clinical interview. It is difficult for us to state positively what kind of stress he could handle and what kind of stress he could not, and I still have not been able to find out. I have talked with his parents last night and I was not able to ascertain an adequate answer even in talking with them, but the opinion we really do have is he does not have the usual ability to handle stimuli of his external environment. He shows some lack of adequate internal censorship, what we call more a dificiency in the superego. He did not seem to distort his perceptions, therefore, he's not psychotic; but he does show a deficiency in integrating his perception. * * * We feel his main deficiency is in his impairment along the lines of integrating what he is perceiving. He does not always kind of hang them together too well. This causes him to have a defect that I think does color his behavior. * * *"

This testimony is inconclusive, and the jury in this case, as in *Myers*, could have rejected the opinion testimony of appellant's expert witness.

 The only question remaining is whether there was competent evidence on which the jury could have based their de-

termination of sanity. There was sufficient testimony regarding the conduct, actions and reactions of the appellant prior to and following the commission of the charged criminal act, from which the jury could have determined that appellant was sane. William L. Burt (a witness and participant to the Butler murder) testified that appellant participated in conversations at which time a plan was established to murder Butler; that appellant was one of the parties who secured the weapons used to murder Butler; that the appellant was the first to stab the victim; that appellant was observed washing his hands to rid them of blood stains; that appellant cut the laundry numbers out of his clothes so that his blood-stained clothes could not identify him; and that appellant wiped his fingerprints off the gymnasium door to make it difficult to trace him to the crime. Sheriff Bright who was called to the State Penitentiary at appellant's request did not notice anything unusual about appellant's actions at the time of his confession. From this testimony it cannot be said that the jury acted arbitrarily or in disregard of the evidence in finding the appellant sane.

## VIII.

 In his next assignment of error, appellant assails the jury instruction defining the statutory measure of sanity. He specifically attacks the following paragraph of the instructions as being ambiguous and misleading:

"The mental disease or defect must be of a substantial nature before it will excuse one from responsibility for his conduct. Repeated criminal or antisocial conduct, standing alone, does not establish a mental defect or disease which will excuse responsibility for wrongful conduct."

This portion of the instruction was adopted from the American Law Institute Test, as set forth in its Model Penal Code § 4.01(2) (Final draft, 1962) which provides:

"(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated or otherwise anti-social conduct."

This paragraph has come to be known as the "caveat paragraph". The purpose of this provision was to exclude a defense for the so-called psychophatic personality.[25]

We are aware only of two federal circuit courts which agree with appellant's argument and have refused to adopt § 4.-01(2).[26] The weight of authority is in the opposite direction.[27] We adhere to our earlier adoption of the ALI test and reject appellant's contention to further modify it.

## IX.

Appellant in his next major grouping of assignments of error, argues that the state failed to prove beyond a reasonable doubt that he had the requisite mental state of mind necessary to support a first degree murder conviction. Appellant contends that the only evidence on this issue was Dr. Cornell's testimony, which he claims established that he could not form an in-

25. See Model Penal Code § 4.01, Comment (Tent.Draft No. 4, p. 160, 1953).

26. See Wade v. United States, 426 F.2d 64 (9th Cir. 1970); United States v. Smith, 404 F.2d 720 (6th Cir. 1968).

27. See United States v. Freeman, 357 F.2d 606 (2nd Cir. 1966); United States v. Currens, 290 F.2d 751 (3rd Cir. 1961); United States v. Chandler, 393 F.2d 920 (4th Cir. 1969) (en banc); Blake v. United States, 407 F.2d 908 (5th Cir. 1969) (en banc); United States v. Frazier, 458 F.2d 911 (8th

Cir. 1972). The D.C.Cir.Ct. of App. in United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972), adopted the "caveat" paragraph as a rule for application by the judge, but not for inclusion in instructions to the jury. However, the court noted that in the D.C.Cir., there already existed a rule that the mere existence of a long criminal record would not excuse a crime. The 10th Cir. has not passed upon this issue. Wion v. United States, 325 F.2d 420 (10th Cir. 1963) (en banc), cert. den., 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309.

tent to kill with sustained deliberation or premeditation. Dr. Cornell testified as follows:

"Now, the first part was an opinion as to the capacity of the defendant to form an intent to kill a person as a result of deliberation or premeditation. Here again when you take a person who has a personality defect, also he has a dull normal I.Q. which makes it a little more difficult for him to cope with things and his overactivity to his environment. With these three defects, and as we mentioned before, his inability to integrate his perceptions, we—our opinion was he did not have the capacity to form an intent to kill with sustained deliberation or premeditation. Now, when we say 'his,' we are talking about him doing it as an individual, not as part of a group, and I think that finishes up the main points of Section 18–211, Idaho Code.

Q. Perhaps you could review the last paragraph, Doctor Cornell, on the last page concerning the—in addition to the intent to kill, I believe that relates to his ability to sustain deliberation and premeditation?

A. Well, the intent to kill as a result of deliberation or premeditation, we find it very difficult to really feel this question in this particular individual; but we did not have any particular trouble in forming an opinion as to whether or not he as an individual has the ability to sustain. We don't feel—the key word here is 'inability to sustain premeditation.' Unless he is fed by some other outside forces, from what we could tell of the man we did not feel he himself would be in a lone planner and plotter type of individual."

In Dr. Cornell's opinion, appellant *alone* could not sustain the necessary premeditation and deliberation that is required to support a first degree murder conviction. Dr. Cornell did not foreclose the possibility that appellant could deliberate or premedi-

tate if he was part of a group or was fed by external forces.

In an effort to prove appellant's involvement in the murder, and his state of mind at the time, the state called Burt to testify. Burt was asked to narrate the events leading up to Butler's death. He testified that appellant participated in a conversation with Macik (a participant to the Butler murder) some time prior to the dinner count on the day of the murder, at which time Macik told appellant that he was going to have to mess Butler up. Burt was then asked to recount what had transpired after the dinner count. He testified that after the dinner count, he, Macik and appellant went to the gym, began to drink, and that appellant and Macik continued to converse about what they were going to do to Butler. A few hours later appellant and Macik left to secure weapons. Burt then testified that after Macik and appellant returned with the weapons, there were more conversations concerning Butler, at which time plans were made to kill him. Burt next told of a conversation that he had with appellant while Macik went to get Butler.

"Q. Now, while Mr. Macik was gone did you have a conversation with the defendant?

A. Yes.

Q. What was that about?

A. He wanted me to hit Mr. Butler and I did not want to.

Q. Did he tell you anything else?

A. Just if I left, then if something happened everybody would blame me for it.

Q. Did you have an argument with them about this—Mr. Powers?

A. What you would call an argument, yes.

Q. Did you agree to hit Mr. Butler when he came in?

A. Yes."

The jury could reasonably have determined from all this testimony that appellant perpetrated the crime with the requisite state of mind necessary to constitute first degree murder.

"To establish the crime of first degree murder, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such an inference, and where the evidence is not within law insufficient, the matter is exclusively within the province of the trier of fact to determine." [cites omitted] [28]

It cannot be said as a matter of law, that the required elements to establish murder in the first degree were not sufficiently established by the evidence. Where the evidence is sufficient to sustain the verdict, this Court will not reverse the judgment on appeal.[29]

28. State v. Foley, 95 Idaho 222, 223–224, 506 P.2d 119, 120–121 (1973).

29. State v. Foley, supra n. 28; State v. Newman, 70 Idaho 184, 190, 214 P.2d 159, 162 (1950); State v. Johnston, 62 Idaho 601, 610, 113 P.2d 809, 812 (1941).

30. The photographer testified as follows:
"Q. Mr. Wells, as to State's Exhibits 5 and 6, what position do they show the body in, face up or face down?
A. No. 5 shows the body face down, No. 6 shows the body face down.
Q. These photographs portray exactly where the body was laying when you found it?
MR. MARCUS: Your Honor, I object to any further questioning on the grounds the Court has already ruled on their admissibility.
THE COURT: Overruled.
THE WITNESS: Yes, this was the position of the body when the mat was rolled away from the top of the body.
BY MR. RISCH:
Q. This mat was rolled how over the body?
A. He was lying face down and the mat was picked up and lifted back away.
Q. He was laying on the mat with the mat rolled over him?
A. Yes, he was laying face down with the mat covered over his back.

## X.

Appellant lastly assigns as error two of the evidentiary rulings made by the trial court. The first pertains to the overruling of his objection to the testimony of a photographer as to the contents of certain photographs which the court refused to allow into evidence. They were color photographs of the victim's body which were offered into evidence during examination by the State of the photographer. The second relates to a hearsay objection made by the State to a question asked by appellant's counsel of one of the accomplices to the crime which was sustained by the court.

Appellant's first evidentiary objection is without merit. The photographer's testimony can hardly be characterized as inflammatory.[30] His testimony was at most cumulative of much of the evidence already introduced at trial. We fail to find error in admitting this testimony into evidence.

Q. And prior to taking these photographs the mat was moved?
A. Yes.
Q. Was the body moved however at the time you took those two photographs?
A. From below some stairways that are there so it could be opened fully, but the body wasn't turned in any way. It was lying in the same position.
Q. The body was laying exactly where it was when you entered the premises?
A. Yes.
Q. As to State's Exhibits 7 and 8, is the body laying on its front or on its back?
A. In both pictures he is laying on his back.
Q. Had he been turned over at the time the photographs were taken?
A. Yes.
Q. Officer, do those photographs portray where the stab wounds were located in the chest and abdomen of the deceased?
A. Yes. There are five stab wounds in the stomach and chest area.
Q. That you can see on the photographs?
A. Yes.
Q. Officer, do those photographs portray the damage to the head area?
A. On these particular two there's very slight indication of head damage."

■ Appellant's second evidentiary objection is also without merit. The specific question asked by appellant's counsel to which objection was sustained by the court was:

"And I believe Mr. Risch (prosecuting attorney) asked you (Mr. Burt) about a conversation Macik had after Nash discussed it with him; what did Macik say Butler wanted to do to Nash?"

Burt testified that he was not present at the time the conversation took place. Therefore his information was not based on personal knowledge, but rather must have come from someone else. Burt was asked to testify as to something someone else had told him. This was offered to prove that Macik told Powers that Butler had assaulted Nash. This was hearsay and inadmissible. Therefore, the trial court was correct in excluding Burt's testimony.

The judgment is affirmed.

McFADDEN, DONALDSON, SHEPARD and BAKES, JJ., concur.